# United States Court of Appeals
## For the Second Circuit

August Term, 2023

Argued *en banc*: May 22, 2024
Decided: October 31, 2024

No. 20-1666

ABDERRAHMANE FARHANE,

*Petitioner-Appellant*,

*v.*

UNITED STATES OF AMERICA,

*Respondent-Appellee.*

Appeal from the United States District Court
for the Southern District of New York
No. 18-cv-11973, Loretta A. Preska, *Judge.*

Before: WALKER, WESLEY, CARNEY, SULLIVAN, PARK, NARDINI, MENASHI, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *Circuit Judges.*[*]

CARNEY, *J.*, filed the majority opinion in which WESLEY, LEE, ROBINSON, PÉREZ, NATHAN, MERRIAM, and KAHN, *JJ.*, joined.

---

[*] Judge Walker, Judge Wesley, and Judge Carney, who are senior judges, participated in this rehearing *en banc* pursuant to 28 U.S.C. § 46(c)(1) and 28 U.S.C. § 294(c).

WESLEY, *J.*, filed a concurring opinion in which LEE, ROBINSON, NATHAN, and MERRIAM, *JJ.*, joined.

PÉREZ, *J.*, filed a concurring opinion in which LEE, ROBINSON, NATHAN, and MERRIAM, *JJ.*, joined.

WALKER, *J.*, filed a dissenting opinion in which SULLIVAN, PARK, and MENASHI, *JJ.*, joined in full, and NARDINI, *J.*, joined as to Part I.

PARK, *J.*, filed a dissenting opinion in which SULLIVAN, NARDINI, and MENASHI, *JJ.*, joined.

NARDINI, *J.*, filed a dissenting opinion.

Over a decade ago, the Supreme Court ruled that the Sixth Amendment requires criminal defense counsel to advise her client whether a guilty plea carries a risk of deportation. Today we hold that the Sixth Amendment entitles a naturalized U.S. citizen facing the risk of deportation following denaturalization to no less protection than a noncitizen facing the risk of deportation. A risk of denaturalization cannot be decoupled from a risk of deportation. A naturalized U.S. citizen considering whether to enter a guilty plea has a constitutional right to be advised by counsel that he may lose his citizenship and be banished from the country as a result.

Petitioner-Appellant Abderrahmane Farhane came to the United States almost thirty years ago, settling with his family in Brooklyn. He became a naturalized U.S. citizen in 2002. In 2006, he pleaded guilty on advice of counsel to serious crimes and served over eleven years in federal prison as a result. The government filed a complaint for denaturalization against him in 2018, over a year after his release from prison, based on conduct admitted to in his plea. Upon learning of the government's intent to denaturalize him, Farhane moved to vacate his plea, conviction, and sentence under 28 U.S.C. § 2255. He asserted an ineffective assistance of counsel claim, alleging that his trial counsel never advised him of the risk of denaturalization and thus, removal, and that he would not have agreed to plead guilty had he known of this risk. The District Court (Preska, J.) denied his motion. On appeal, a divided panel affirmed the denial.

In these en banc proceedings, we **VACATE** the decision of the prior panel Majority; **VACATE** the judgment of the District Court denying habeas relief to Farhane; and **REMAND** the case to allow the District Court to reevaluate Farhane's *Strickland* claim consistent with this opinion.

RAMZI KASSEM (Naz Ahmad, Mudassar Toppa, CLEAR
    Project, Main Street Legal Services, Inc., CUNY School
    of Law, Long Island City, NY; Alan E. Schoenfeld,
    Emily Barnet, Sandra Redivo, Trena M. Riley, Dylan
    Reichman, Wilmer Cutler Pickering Hale and Dorr
    LLP, New York, NY; Thad Eagles, Jeremy W. Brinster,
    Wilmer Cutler Pickering Hale and Dorr LLP,
    Washington, DC; Asma S. Jaber, Wilmer Cutler
    Pickering Hale and Dorr LLP, Boston, MA, *on the
    brief*), *for Petitioner-Appellant Abderrahmane Farhane.*

KARL METZNER (Jun Xiang, Hagan Scotten, *on the brief*), *for
    Damian Williams, United States Attorney for the
    Southern District of New York, New York, NY, for
    Respondent-Appellee United States of America.*

John C. Yang, Niyati Shah, Marita Etcubañez, Asian
    Americans Advancing Justice, Washington, DC;
    Andrew Z. Michaelson, Mateo de la Torre, King &
    Spalding LLP, New York, NY, *for Amicus Curiae Asian
    Americans Advancing Justice in Support of Petitioner-
    Appellant Abderrahmane Farhane.*

Andrew Wachtenheim, Nabilah Siddiquee, Immigrant
    Defense Project, New York, NY, *for Amicus Curiae
    Immigrant Defense Project in Support of Petitioner-
    Appellant Abderrahmane Farhane.*

Joel B. Rudin, Matthew A. Wasserman, National Association
    of Criminal Defense Lawyers, New York, NY; Richard
    D. Willstatter, New York State Association of Criminal
    Defense Lawyers, White Plains, NY; S. Isaac Wheeler,
    Federal Defenders of New York, Inc., New York, NY,
    *for Amici Curiae National Association of Criminal Defense
    Lawyers, New York State Association of Criminal Defense
    Lawyers, Federal Defenders of New York, Inc., Federal
    Public Defender's Office for the Western District of New*

3

*York, Office of the Federal Public Defender for the District of Connecticut, Office of the Federal Public Defender for the District of Vermont, and Office of the Public Defender for the Northern District of New York in Support of Petitioner-Appellant Abderrahmane Farhane.*

Alyssa Barnard-Yanni, Andrew D. Silverman, Daniel A. Rubens, Orrick, Herrington & Sutcliffe LLP, New York, NY; Lauren A. Weber, Orrick, Herrington & Sutcliffe LLP, Seattle, WA, *for Amici Curiae Professors of Criminal Law, Criminal Procedure, and Immigration Law in Support of Petitioner-Appellant Abderrahmane Farhane.*

CARNEY, *Circuit Judge*:

In these en banc proceedings, we consider whether a naturalized United States citizen has a Sixth Amendment right to be advised by counsel that he may be denaturalized and deported as a result of his entry of a guilty plea. In its 2010 decision in *Padilla v. Kentucky*, 559 U.S. 356, the Supreme Court ruled that the Sixth Amendment requires criminal defense counsel to advise her client of a risk of deportation associated with such a plea. Today we hold that the Sixth Amendment entitles a naturalized U.S. citizen facing the risk of deportation following denaturalization to no less protection than a noncitizen facing the risk of deportation. Deportation following denaturalization proceedings is a severe, adverse immigration consequence that is covered by *Padilla*. To provide constitutionally effective advice, counsel must address the risk of this consequence with her naturalized citizen client before he decides to enter a guilty plea.

Like most courts, ours has generally drawn a distinction between "direct" and "collateral" consequences of a conviction to provide a useful boundary between what the Sixth Amendment requires counsel to address (the possible sentence of incarceration, for example, is a "direct" consequence) and what counsel need not address (the loss of an occupational license, on the other hand, is likely "collateral"). In

4

the past, we have treated adverse immigration consequences including deportation as collateral, being beyond both the power of the sentencing court itself to impose and perhaps beyond a criminal defense counsel's presumptive area of expertise. *See Michel v. United States*, 507 F.2d 461, 465–66 (2d Cir. 1974).

In *Padilla*, however, the Supreme Court disavowed that binary framework as a tool for assessing counsel's obligations when permanent removal from the country was a possible consequence. That immigration result was too severe, its imposition too closely connected with the criminal process, and its effect upon families too drastic, the Court reasoned, to be lumped categorically together with other "collateral" consequences of a guilty plea. Accordingly, the Court determined that counsel has a constitutional duty to advise her client on this subject.

Accepting this premise in Padilla's case, and then applying the principles established in *Strickland v. Washington*, 466 U.S. 668 (1984), to govern ineffective assistance claims, the Court found that counsel fell below objective standards of competence by neglecting to alert Padilla that his plea agreement with the government would open the door to his removal from the country. That risk, the Court said, could not constitutionally be ignored by counsel. Nor was affirmative misadvice necessary to raise the constitutional concern, it stressed: silence on the subject breached the Sixth Amendment duty to advise. The Court explained that the prospect of removal from the country may be more important to a defendant than time served behind bars, and counsel bears a duty at least to call to her client's attention the risk of such serious adverse immigration consequences.

In the government's 2023 fiscal year, 878,500 persons became U.S. citizens. In the decade from 2012 to 2023, the United States naturalized more than 7.7 million persons.[1] Those individuals earned that cherished status and swore allegiance to the Constitution after a lengthy, multi-layered process that calls for determination and commitment. More will do so this year. If it is later determined that a naturalized citizen obtained his citizenship by fraud or false statements, the law provides a mechanism by which that citizenship may be revoked. *See* 8 U.S.C. § 1451. But the Constitution has long been understood to protect naturalized citizens—even those who run afoul of our criminal laws—just as it does U.S.-born citizens, affording each the effective advice of counsel when they are caught up in the criminal process. As the Court long ago observed in *Schneider v. Rusk*, aside from the Constitution's requirement that only natural-born citizens are eligible to be President, a naturalized citizen "possess[es] all the rights of a native citizen, and stand[s], in the view of the constitution, on the footing of a native." 377 U.S. 163, 166 (1964) (internal quotation marks omitted).

We now reaffirm that understanding and decide that, applying *Padilla* and its clarifying companion case, *Chaidez v. United States*, 568 U.S. 342 (2013), criminal defense attorneys have a Sixth Amendment obligation to inquire into and advise a naturalized citizen client of any risk of deportation following denaturalization proceedings that accompany the client's guilty plea, just as they do for a deportation risk facing a noncitizen client. If the plea carries such a risk and counsel has failed to address it, then the two-pronged *Strickland* test applies: we ask whether counsel's performance fell below an objective standard of reasonableness at the time, and whether the client has shown that he was prejudiced by counsel's deficient performance. The outcome of a

---

[1] U.S. Citizenship & Immigr. Servs., *Naturalization Statistics*, https://www.uscis.gov/citizenship-resource-center/naturalization-statistics (last updated May 9, 2024).

Sixth Amendment challenge to the conviction will hinge on the answers to those questions.

Petitioner-Appellant Abderrahmane Farhane came to the United States from Morocco almost thirty years ago, in 1995. He was naturalized in 2002. He has six children, two of whom were naturalized through him and two of whom are U.S. citizens through their birth here. In 2006, Farhane pleaded guilty on advice of counsel to serious crimes charged in the Southern District of New York. He served more than eleven years in federal prison as a result.

Within a year of his release from prison, however, the government began proceedings to denaturalize him based on conduct admitted to in his plea agreement—proceedings acknowledged to be a precursor to deportation. Farhane then brought a challenge by motion for habeas relief under 28 U.S.C. § 2255. He asserted that, contrary to his Sixth Amendment rights, his counsel never advised him of the risk of denaturalization and deportation, and that he would not have agreed to enter the plea had he known that he might be banished from this country and separated from his family as a result. The District Court denied his motion. On appeal, a divided prior panel affirmed the denial.

On review, we VACATE the decision of the prior panel Majority; VACATE the judgment of the District Court denying habeas relief to Farhane; and REMAND the case to allow the District Court to address the *Strickland* ineffective assistance questions in the first instance, in the context of the Sixth Amendment understandings set forth here.

7

## BACKGROUND

**I.      Factual and procedural background**

**A.      <u>Farhane's immigration history</u>**

Abderrahmane Farhane immigrated to this country from Morocco in 1995, at about age 40, after visiting the country on three occasions beginning in the late 1980s. He and his wife and four Moroccan-born children settled in Brooklyn, where he ran a small bookstore.

In March 2001, he applied to become a naturalized U.S. citizen by completing and submitting the form provided for that purpose by the Immigration and Naturalization Service ("INS"). Among the many questions that form requires the applicant to answer is one that is particularly broad: "Have you ever . . . knowingly committed any crime for which you have not been arrested?" Farhane checked the box marked "No" in response. About one year later, in March 2002, he participated in an in-person interview with an INS official as his next step toward naturalization. There, he was asked and repeated under oath his negative answer to that question. Then, on April 19, 2002, after swearing to the veracity of that and other answers given on the form a third time, he took the oath of citizenship and became a naturalized U.S. citizen.

In time, his answers in March 2001 and in March and April 2002 to that sweeping question became one of two bases for the government's denaturalization complaint against him: that by answering "No," he purportedly concealed material facts related to his application; and that the material facts that the "No" concealed further demonstrated, the government alleged, that he was not a person of good moral character. On these two bases, the government later charged, a federal district court was bound to revoke his naturalization.

8

### B. Farhane's criminal conduct, guilty plea, and sentence

In 2005, the U.S. Attorney for the Southern District of New York charged Farhane by complaint with providing false statements in violation of 18 U.S.C. § 1001. In 2006, a superseding indictment that now named other codefendants (Tarik Shah, Rafiq Sabir, and Mahmud Faruq Brent) charged Farhane with two criminal counts: in Count 5, conspiracy to provide material support for terrorism, *see* 18 U.S.C. § 2339A; and in Count 6, making false statements to law enforcement officers in connection with a terrorism investigation, *see id.* § 1001(a)(2).[2] The superseding indictment further alleged that from about November 2001 through June 2005, Farhane and Shah "agreed with each other to assist another individual to transfer money from the United States to locations overseas to purchase weapons and communications equipment for jihadists in Afghanistan and Chechnya, and attempted to hide the nature of that assistance from United States authorities." App'x at 75–76. The "[]other individual" referred to in this count was a confidential informant for the FBI. The record contains no evidence that any money was transferred overseas in connection with the charged conspiracy. Count 5 carried a statutory maximum sentence of fifteen years.

The allegations of Count 6 rested primarily on a conversation that took place in 2005 between Farhane and an FBI agent. In that conversation, Farhane denied having a conversation with the confidential informant about sending money overseas to jihadists or meeting the informant in person. He falsely explained that he had provided a phone number to the informant merely to help that person send money overseas by wire transfer at lower cost. (The conversation in question was one referred to in the

---

[2] The superseding indictment appears to have been the first indictment obtained against Farhane. But because it was entered on the District Court's docket as a "superseding indictment," App'x at 46, we (like the parties) refer to it in this way as well.

conspiracy count, Count 5.) Count 6 carried a statutory maximum sentence of eight years.

On November 9, 2006, on advice of counsel, Farhane entered a plea agreement in which he pleaded guilty to one count of conspiracy to commit money laundering, *see* 18 U.S.C. § 371, and one count of making materially false statements involving international terrorism, *see id.* § 1001(a)(2). The agreement stipulated a maximum sentence of 13 years—the combined statutory maximum for the counts of conviction. In pleading guilty, he also waived his right to appeal or attack collaterally any sentence at or below the stipulated maximum. He had no known prior criminal record.

At his change-of-plea hearing, Farhane stated that he was guilty of the conspiracy charge because he had "agreed with others in the month[s] of November and December of 2001 to transfer money for mujahideen in Afghanistan and Chechnya." App'x at 194. As to the false statements charge, he acknowledged that in 2005 he gave false answers when questioned as part of an FBI terrorism investigation.

In April 2007, the District Court (Preska, J.) entered judgment against Farhane and sentenced him to the statutory maximum term of 13 years' incarceration and a two-year term of supervised release. Farhane timely filed a notice of appeal and expressed to appellate counsel his desire to raise ineffective assistance and other claims related to the District Court proceedings. But in 2008, his appointed appellate counsel moved under *Anders v. California*, 386 U.S. 738 (1967), to withdraw the appeal, citing the waiver in Farhane's plea agreement and other considerations. Three years later, in February 2011, after the trial and appeal of Farhane's codefendant Sabir, we granted counsel's *Anders*

10

motion and dismissed Farhane's appeal in a brief order.[3] *See United States v. Farhane (Sabir)*, 634 F.3d 127, 132 n.2 (2d Cir. 2011).

Meanwhile, Farhane was incarcerated for eleven years. In May 2017, after his release from prison, he began his two-year term of supervised release.

C.      The 2018 denaturalization proceedings

In July 2018, just over a year after his release from prison and into his term of supervised release, the government advised Farhane that it had begun a civil denaturalization action against him. Proceeding under 8 U.S.C. § 1451(a), the government alleged in its civil complaint that Farhane had obtained his naturalization unlawfully. The complaint contained two pivotal assertions, both based on Farhane's 2006 guilty plea. First, it asserted that his guilty plea conclusively showed that Farhane knowingly committed crimes pre-dating his April 2002 naturalization. Farhane's admission in 2006 to those pre-April 2002 crimes, in turn, established that he gave false testimony under oath in his March 2002 INS interview. Thus, he had procured his naturalization by concealing a material fact: that he had committed a crime for which he had not been arrested.

Second, it asserted that this false testimony and his pre-April 2002 criminal acts themselves conclusively established that he could not show in April 2002 that he was a "person of good moral character," as he had to, to naturalize then. App'x at 315–17. No more was needed to require the court to enter the requested order of denaturalization: the government reminded the District Court that it enjoyed no equitable discretion to second-guess these facts and deny entry of a judgment of denaturalization against

---

[3] Counsel's *Anders* motion in 2008 pre-dated the 2010 *Padilla* decision, and so did not address its import; our 2011 order made no mention of *Padilla*.

Farhane as a naturalized citizen whose "citizenship was procured illegally or by willful misrepresentation of material facts." *Id.* at 314.

> D.   Farhane's § 2255 motion

Four months later, in December 2018, Farhane moved under 28 U.S.C. § 2255 to vacate his plea and sentence. In his accompanying affidavit, he averred that his trial counsel did not advise him that his plea carried a risk of denaturalization and deportation. Farhane asserted:

> I would not have entered a guilty plea if [counsel] had told me that I could lose my U.S. citizenship as a result. I would not have entered a guilty plea if [counsel] had told me that I could face deportation as a result. I would not have entered a guilty plea if [counsel] had told me that my children could lose their U.S. citizenship as a result.

App'x at 299 (para. numbering omitted). He alleged that counsel knew he was a naturalized citizen and that counsel had so advised the court at Farhane's first detention hearing, in 2005. Yet counsel never alerted him to the possibility of denaturalization and deportation raised by his plea or advised him with respect to that risk. On this basis, Farhane submitted, his plea was invalid.

The government opposed Farhane's motion. It maintained that the Sixth Amendment does not require counsel to advise about "collateral consequences" such as denaturalization. As to his risk of deportation, it responded, "That argument is meritless because, at the time of the plea, Farhane was a citizen and therefore could not be deported." S.D.N.Y. No. 1:18-cv-11973 Doc. 22, at 14 n.9. It further suggested that the criminal case outcome would have been the same because, even had he been advised of the risk of denaturalization and deportation, he would have chosen to take the 13-year term of imprisonment over the 23-year term to which he was exposed absent the plea agreement. Farhane countered that the stakes to him were such that he would have chosen to go to trial and take the chance of receiving a longer sentence.

12

The District Court denied Farhane's § 2255 motion. It explained that it saw nothing in the record to suggest that his lawyer "should have known" about his exposure to denaturalization. *United States v. Farhane*, No. 18 Civ. 11973, 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020). *Padilla* had been handed down in the interim between Farhane's sentencing and his § 2255 motion (and before the judgment in the criminal case against him became final). But *Padilla* had no bearing on Farhane's case, the Court reasoned, because Farhane's "conviction itself did not give rise to an imminent risk of deportation, as was the case in *Padilla*." *Id.* Instead, Farhane's risk of denaturalization "stemmed from his misrepresentations . . . and his having illegally procured naturalization." *Id.* And in any event, although Farhane's counsel knew Farhane was naturalized, he had "no basis for suspecting that the guilty plea could have immigration consequences[.]" *Id.*

In August 2023, a divided panel of this Court affirmed the District Court's denial of relief, concluding that civil denaturalization is a collateral and not a direct consequence of a conviction, and that the Sixth Amendment therefore imposes no obligation on attorneys to warn of that risk. *See Farhane v. United States*, 77 F.4th 123, 126 (2d Cir. 2023). In 2024, we ordered this rehearing en banc.

The denaturalization proceedings brought against Farhane have been stayed pending resolution of his appeal in our Court.

## DISCUSSION

We first consider whether, under *Padilla*, the Sixth Amendment requires a criminal defense attorney to inform a naturalized citizen client whether his guilty plea carries a risk of denaturalization and deportation. Concluding that it does, we then turn to Farhane's *Strickland* claim and decide to remand his case to the District Court. On remand, the District Court should allow the parties to develop the record further and

13

conduct an evidentiary hearing as needed. It should then reevaluate, in light of the Sixth Amendment understandings set forth here, whether Farhane has established two propositions: that his lawyer's conduct was objectively unreasonable; and that he was prejudiced as a result.

Whether defense counsel rendered ineffective assistance presents a mixed question of law and fact that we review de novo. *Doe v. United States*, 915 F.3d 905, 910 (2d Cir. 2019).

**I.**      **The Sixth Amendment requires an attorney for a naturalized U.S. citizen to provide advice about the risk of denaturalization and deportation flowing from the citizen's guilty plea.**

The question we confront is whether Farhane's Sixth Amendment right to counsel was violated when his attorney failed to inform him that his guilty plea could lead to his denaturalization and deportation. The Supreme Court has described the analysis undertaken in *Padilla* as follows: "[P]rior to asking *how* the *Strickland* test applied ('Did this attorney act unreasonably?'), *Padilla* asked *whether* the *Strickland* test applied ('Should we even evaluate if this attorney acted unreasonably?')." *Chaidez*, 568 U.S. at 349 (emphasis in original). We take the same approach here, considering first whether the Sixth Amendment requires counsel to advise a naturalized citizen client of the risk of denaturalization and related deportation that may result from a guilty plea.

We conclude that, under *Padilla*, a naturalized U.S. citizen has a Sixth Amendment right to be advised by counsel that he may be denaturalized and deported as a result of his entry of a guilty plea.[4] Because a guilty plea to a conviction that

---

[4] The Sixth Amendment provides in relevant part that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. The Sixth Amendment right has long been recognized to encompass the right to effective counsel in deciding whether to enter a guilty plea. *See Lafler v. Cooper*, 566 U.S. 156, 162

exposes a criminal defendant to the risk of denaturalization necessarily exposes him to the risk of deportation, a straightforward application of *Padilla*—holding that "counsel must inform her client whether his plea carries a risk of deportation," 559 U.S. at 374— resolves the question. Alternatively, because denaturalization is a "particularly severe" consequence, and "nearly an automatic result" of a guilty plea to certain offenses, advice regarding denaturalization, like advice regarding deportation, "is not categorically removed from the ambit of the Sixth Amendment right to counsel." *Id.* at 365–66. To provide effective representation, counsel must advise her client as to that paired set of serious adverse immigration consequences by at least flagging the risk. As many have observed, the risk of banishment may weigh more heavily in a criminal defendant's assessment of his options than any particular sentence of incarceration. *See, e.g.*, *Lee v. United States*, 582 U.S. 357, 370 (2017) ("[W]e have recognized that preserving the client's right to remain in the United States may be more important to the client than any potential jail sentence." (internal quotation marks omitted)). This is so whether the defendant is a noncitizen weighing the risk of deportation or a naturalized citizen weighing the risk of denaturalization and deportation.

In sum, whether viewed as a direct application of *Padilla*'s holding or a necessary result of its core reasoning, the constitutional bottom line is clear: criminal defense counsel has a Sixth Amendment duty to advise a naturalized citizen client that entering a guilty plea exposes him to a risk of denaturalization and deportation.[5]

---

(2012); *Hill v. Lockhart*, 474 U.S. 52, 58–59 (1985); *Kovacs v. United States*, 744 F.3d 44, 49 (2d Cir. 2014).

[5] Congress's 1996 amendments to our immigration laws "involved a change in nomenclature; the statutory text now uses the term 'removal' rather than 'deportation.'" *Padilla*, 559 U.S. at 364 n.6. We use these terms interchangeably throughout.

The government argues that a summary application of the familiar distinction between direct and collateral consequences of a conviction places the risk of denaturalization and deportation outside the scope of the Sixth Amendment. Civil denaturalization falls into the "collateral" pile, the government asserts, urging on this analysis that counsel simply has no constitutional obligation to advise clients of such a risk. Further, the government maintains, *Padilla* addressed the Sixth Amendment rights to effective counsel of noncitizens only and said nothing about the rights of naturalized citizens. We reject these contentions. As previewed above and as detailed below, the government's arguments cannot be reconciled with *Padilla*.

A.     Farhane's guilty plea carried a risk of deportation.

Applying the Supreme Court's holding in *Padilla* answers the question before us. A risk of denaturalization simply *is* a risk of deportation.[6] And, as *Padilla* instructs, to satisfy the Sixth Amendment's requirement of effective assistance in a criminal prosecution, "counsel must inform her client whether his plea carries a risk of

---

[6] *See* Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull. 5, 17 (July 2017) (stating that the government typically "does not expend resources on civil denaturalization actions unless the ultimate goal is the removal of the defendant from the United States"). Judge Walker's Dissent takes issue with our reliance on the government's representation in the noted publication that it typically does not pursue civil denaturalization unless it also intends to seek deportation. It argues that the representation deserves little weight, reasoning that the government's process is "subject to change depending on the presidential administration." Dissent (Walker, *J.*) at 8 n.7. We agree that, as that Dissent observes, "[o]ur Sixth Amendment analysis should not depend on the varying prosecutorial priorities of the Department of Justice." *Id*. The Majority's Sixth Amendment analysis does not depend, however, on potentially variable prosecutorial priorities. Rather, the risk that triggers the Sixth Amendment duty here derives from the statutory schemes that render certain individuals subject to deportation. *See infra* nn.7, 9, 11. In contrast, no statutory scheme compels the result reached by Judge Walker's Dissent. The Sixth Amendment interpretation and the direct/collateral framework that it invokes represent doctrines adopted by the lower courts over the years. Applying those doctrines alone would leave naturalized citizens uniquely, and paradoxically, without the Sixth Amendment protection that *Padilla* affords.

deportation." 559 U.S. at 374. Thus, applying *Padilla* to the case at bar, it is clear that the Sixth Amendment requires criminal defense counsel to advise his client of the risk of denaturalization and the associated heightened risk of deportation that flow from his guilty plea.

Farhane's case illustrates why a guilty plea that carries a risk of denaturalization necessarily carries a risk of deportation. The government initiated civil denaturalization proceedings against him in 2018, soon after his release from prison, using the admissions in his 2006 guilty plea as the foundation of its civil complaint. In that complaint, the government charges that Farhane's naturalization was "illegally procured" or "procured by concealment of a material fact or by willful misrepresentation," 8 U.S.C. § 1451(a), referring to the statements Farhane made about his 2001 conduct in his guilty plea.[7] Indeed, in its denaturalization complaint, the

---

[7] "[F]ailure to comply with the statutory prerequisites for naturalization renders [a] certificate of citizenship revocable as 'illegally procured' under 8 U.S.C. § 1451(a)." *Fedorenko v. United States*, 449 U.S. 490, 514 (1981). One such prerequisite is that the applicant be "a person of good moral character" for the five years (the "statutory period") preceding his application for citizenship. 8 U.S.C. § 1427(a)(3). The current standard citizenship application form asks all applicants, "Have you **EVER** committed . . . a crime or offense for which you were **NOT** arrested?" *Maslenjak v. United States*, 582 U.S. 335, 346 (2017) (bold in original), and the form submitted by Farhane used almost identical language, *see* App'x at 334 ("Have you ever . . . knowingly committed any crime for which you have not been arrested?"). By regulation, an admission to having engaged in many types of criminal conduct within the statutory period automatically precludes an applicant from demonstrating the "good moral character" required for naturalization. *See* 8 C.F.R. §§ 316.10(b)(2)(vi) (lack of good moral character if, during the statutory period, the applicant has given false testimony to obtain an immigration benefit), (b)(3)(iii) (lack of good moral character if, during the statutory period, the applicant committed unlawful acts that adversely reflect upon his moral character, or was convicted or imprisoned for such acts).

A naturalized citizen who willfully fails to disclose such conduct (occurring within the statutory period) when applying for citizenship will also have procured his naturalization "by concealment of a material fact or by willful misrepresentation." 8 U.S.C. § 1451(a); *see also Kungys v. United States*, 485 U.S. 759, 767 (1988). Thus, a naturalized citizen who pleads guilty in any context to any such pre-naturalization conduct that occurred within the statutory period—

government argues that Farhane, by way of his guilty plea, "is collaterally estopped from contesting those matters determined by the judgment in the criminal case." App'x at 314. As the government conceded at oral argument in these en banc proceedings, the collateral estoppel effect of Farhane's plea therefore makes it "provably easier" for the government to establish the facts necessary to denaturalize him. *See* En Banc Oral Arg. Tr. at 67:10–13. The court adjudicating the government's denaturalization petition will have "no discretion to excuse the conduct." *Fedorenko v. United States*, 449 U.S. 490, 517 (1981). The government admonished the District Court accordingly in its denaturalization complaint against Farhane. *See* App'x at 314. And once his citizenship is revoked, Farhane will be subject to removal as a noncitizen convicted of an aggravated felony. *See* 8 U.S.C. §§ 1101(a)(43)(D), (U), 1227(a)(2)(A)(iii); *Sessions v. Dimaya*, 584 U.S. 148, 153 (2018) ("[R]emoval is a virtual certainty for an alien found to have an aggravated felony conviction, no matter how long he has previously resided here.").[8]

---

including, for example, a guilty plea to driving while under the influence, *see* U.S. Citizenship & Immigr. Servs., *Instructions for Application for Naturalization*, at 21 (Apr. 1, 2024)—will necessarily have illegally procured his citizenship and failed to disclose that conduct when applying for citizenship. *See* 8 U.S.C. §§ 1427(a), 1451(a). That guilty plea makes the citizen vulnerable to a civil complaint under the denaturalization statute, which provides that "[i]t shall be the duty of the United States" government "to institute [denaturalization] proceedings" in these circumstances. *Id.* § 1451(a).

[8] As Judge Wesley notes in concurrence, two Circuits have held that a noncitizen is not removable under the aggravated felony provision, 8 U.S.C. § 1227(a)(2)(A)(iii), if the person was a U.S. citizen at the time of conviction. Concurrence (Wesley, J.) at 1 n.1. *See Singh v. Att'y Gen. of U.S.*, 12 F.4th 262 (3d Cir. 2021); *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154 (11th Cir. 2021). Even if this Circuit were to adopt our sister Circuits' construction of the aggravated felony provision— an issue not presented to the en banc court—Farhane would still face a risk of deportation. As Farhane's counsel conceded at oral argument, if now denaturalized, Farhane would still be deportable on grounds other than the instant conviction. En Banc Oral Arg. Tr. at 77:24–78:3. Moreover, the unsettled nature of the question of the aggravated felony provision's applicability to naturalized citizens further demonstrates the risk facing those like Farhane, who must assess whether to enter a guilty plea. *Padilla* instructs that even such an "unclear or

18

The government's request that we apply *Padilla* only where a "direct linkage" exists between a conviction resulting from a guilty plea and deportation cannot be reconciled with *Padilla*. En Banc Oral Arg. Tr. at 43:7–15. To be sure, for a naturalized citizen defendant, the risk of deportation is one step further removed from entry of a guilty plea than it is for a noncitizen: the government must obtain his denaturalization before it can initiate removal proceedings. The *Padilla* Court, however, expressly ruled that the Sixth Amendment requires counsel to advise her client regarding the deportation consequences of his plea, whether or not those consequences are clear or certain. In situations where "the law is not succinct and straightforward," the Court clarified, "a criminal defense attorney need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences." *Padilla*, 559 U.S. at 369; *see also id.* at 375 (Alito, J., concurring) (expressing view that counsel "must . . . advise the defendant that a criminal conviction may have adverse immigration consequences and that, if the alien wants advice on this issue, the alien should consult an immigration attorney," but that counsel need not "explain what those consequences may be"). Where entry of an order of deportation is a step removed from the guilty plea, as it is for naturalized citizen defendants, the path from plea to eventual deportation may indeed be less straightforward than that faced by Padilla. But that alone does not remove advice regarding the risk from the ambit of the Sixth

---

uncertain" risk of deportation is sufficient to trigger the Sixth Amendment duty to advise. *Padilla*, 559 U.S. at 369. The Dissent attempts to downplay the connection between Farhane's plea and his denaturalization by emphasizing the defenses that Farhane might still theoretically raise against the three denaturalization counts in the government's petition. Dissent (Walker, *J.*) at 6–7. Farhane's counsel stated at oral argument in our en banc proceedings that he is not aware of any actually viable defenses to those counts based on current caselaw. En Banc Oral Arg. Tr. at 78:4–79:5. The merits of those defenses are not before us, of course. It suffices to note that the mere possibility that the government might be unsuccessful in its attempts to denaturalize or deport Farhane does nothing to negate the fact that Farhane faced a cognizable, serious risk when he decided to enter his guilty plea.

Amendment: "Lack of clarity . . . does not obviate the need for counsel to say *something* about the possibility of deportation, even though it will affect the scope and nature of counsel's advice." *Id.* at 369 n.10 (emphasis added).

Farhane's guilty plea carried not only the risk of denaturalization but also, and inevitably, the risk of deportation. Under *Padilla*, counsel advising a client in Farhane's circumstances is constitutionally obligated to advise that his plea "may carry a risk of adverse immigration consequences." *Id.* at 369.

B.   The direct/collateral distinction is also "ill suited" to evaluating the risk of denaturalization, and so counsel has a constitutional obligation to advise of such a risk.

A faithful application of *Padilla*'s underlying reasoning similarly compels the conclusion that advice about the risk of denaturalization falls within the scope of the Sixth Amendment. In finding deportation "uniquely difficult to classify as either . . . direct or . . . collateral" and thus "ill suited" to categorization under the direct/collateral framework, *id.* at 366, the *Padilla* Court highlighted two aspects of the consequence. First, it stressed that deportation is a "particularly severe penalty." *Id.* at 365 (internal quotation marks omitted). Second, it observed that deportation was "nearly an automatic result for a broad class of noncitizen offenders," emphasizing "its close connection to the criminal process" and noting how "[o]ur law has enmeshed criminal convictions and the penalty of deportation for nearly a century." *Id.* at 365–66. The same considerations apply fully to the consequence of denaturalization.

It is not disputed here that denaturalization is a "particularly severe" consequence. *Id.* at 365. The Supreme Court "has long recognized the plain fact that to deprive a person of his American citizenship is an extraordinarily severe penalty." *Klapprott v. United States*, 335 U.S. 601, 612 (1949); *see also id.* at 616–17 (Rutledge, J., concurring) (stating that "[t]o take away a man's citizenship deprives him of a right no

20

less precious than life or liberty" and that "in its wake may follow the most cruel penalty of banishment"). If Farhane loses his citizenship, he loses his home of over thirty years, his business, his life with his family; in addition, two of his children, who derived citizenship through him, stand to lose their citizenship here as well. *See* 8 U.S.C. § 1451(d).[9]

For naturalized citizens who plead guilty to criminal conduct pre-dating their naturalization—and within the statutory period—their convictions create a "nearly . . . automatic" risk of denaturalization. *See Padilla*, 559 U.S. at 366. Farhane's circumstances exemplify this fact. As outlined above, he admitted through his guilty plea that, beginning in November 2001, he conspired to commit money laundering in violation of 18 U.S.C. § 371. In the denaturalization proceedings that the government initiated against him soon after his release from his thirteen-year sentence, he will be unable to contest or explain in any way the operative facts: that he illegally procured his citizenship based on criminal conduct occurring shortly before his 2002 naturalization, and that he concealed a material fact or made a willful misrepresentation regarding that criminal conduct by failing to disclose it in his March 2002 interview. *See* 8 U.S.C. § 1451(a). And, as already noted, the court adjudicating the government's denaturalization petition will have no discretion to excuse the conduct.[10] Thus,

_____

[9] When an individual is denaturalized based on concealment of a material fact or willful misrepresentation in procuring naturalization—as would be the case with Farhane—any person claiming citizenship through such denaturalized person "shall be deemed to have lost . . . citizenship." 8 U.S.C. 1451(d); *see also* Bianco et al., at 16 ("If the defendant's spouse or children obtained citizenship based on the defendant's naturalization, the denaturalization judgment revokes the spouse's and children's naturalization as a matter of law.").

[10] The lack of discretion afforded the courts "to ameliorate unjust results on a case-by-case basis" also informed the *Padilla* Court's analysis with respect to deportation. 559 U.S. at 362. For the better part of the twentieth century, the Court stated, sentencing judges had "conclusive authority to decide whether a particular conviction should be disregarded as a basis for deportation," *id.* (quoting *Janvier v. United States*, 793 F.2d 449, 452 (2d Cir. 1986)), through a

21

Farhane's guilty plea and conviction, on one hand, and the consequence of denaturalization, on the other, are "enmeshed"; and denaturalization has a "close connection to the criminal process." *Padilla*, 559 U.S. at 365–66.

The government attempts to limit *Padilla*'s application, contending that denaturalization is not as "nearly . . . automatic" a consequence of a conviction as is deportation. *Id.* at 366. But its arguments in this vein fail to persuade.

*First*, we reject the government's suggestion that "nearly . . . automatic" means "definite" or "immediate." *Id.*; *see also* Gov't Br. at 18 (maintaining that civil denaturalization is neither a "definite" or "immediate" consequence of a criminal conviction). As discussed above, the Court in *Padilla* did not limit its holding to cases in which deportation would certainly or immediately follow a criminal conviction. *See Padilla*, 559 U.S. at 369 (clarifying that counsel's Sixth Amendment duty to advise attaches even to cases where "the deportation consequences of a particular plea are unclear or uncertain"). Instead, it repeatedly stressed that constitutionally effective counsel has an obligation to warn of a "*risk* of deportation." *Id.* at 366 (emphasis added); *see also id.* at 367 ("The weight of prevailing professional norms supports the view that counsel must advise her client regarding the *risk* of deportation." (emphasis added)); *id.* at 374 ("[W]e now hold that counsel must inform her client whether his plea carries a *risk* of deportation." (emphasis added)). Put simply, *Padilla* was focused on cases

---

procedure known as a judicial recommendation against deportation, or JRAD. *Id.* at 361–62. But by 1990, Congress had entirely eliminated the JRAD procedure. *Id.* at 363. Courts thus went from having ample discretion to grant relief to deportable noncitizens to having none at all. *Id.* at 363–64. "These changes to our immigration law," the *Padilla* Court observed, "have dramatically raised the stakes of a noncitizen's criminal conviction," and "accurate legal advice for noncitizens accused of crimes has never been more important." *Id.* at 364. These concerns carry equal weight in the denaturalization context, in which courts, too, have no discretion to grant relief to naturalized U.S. citizens eligible for denaturalization, even when granting such relief would "ameliorate unjust results." *Id.* at 362.

involving advice as to whether a guilty plea would make a criminal defendant *deportable*, not just on cases where deportation would inescapably follow. *See, e.g., id.* at 360 ("We agree with Padilla that constitutionally competent counsel would have advised him that his conviction for drug distribution made him *subject to* automatic deportation." (emphasis added)); *id.* at 370 ("When attorneys know that their clients face *possible* exile from this country and separation from their families, they should not be encouraged to say nothing at all." (emphasis added)); *id.* at 373 (observing that "informed consideration of *possible* deportation can only benefit both the [government] and noncitizen defendants during the plea-bargaining process" (emphasis added)). Farhane's guilty plea and conviction created a "nearly . . . automatic" risk of denaturalization, *id.* at 366, because his admissions to criminal conduct in his plea established his ineligibility for naturalization, in accordance with the applicable statutory and regulatory provisions—just as Padilla's guilty plea made him subject to deportation under the relevant immigration laws. That Farhane's plea makes it "provably easier," in the government's words, for the government to denaturalize him renders the risk of denaturalization a sufficiently automatic consequence of his guilty plea, at least under *Padilla*'s reasoning. *See* En Banc Oral Arg. Tr. at 67:10–13.

*Second*, and relatedly, even deportation in Padilla's circumstances is not as "automatic" as the government now makes it out to be. For instance, the government suggests the comparison is invalid because "[c]ivil denaturalization cannot occur unless [it] initiates a separate civil proceeding under 8 U.S.C. § 1451(a)." Gov't Br. at 18. The same is true, however, of deportation proceedings that follow entry of a guilty plea: an additional judicial or agency proceeding is required before deportation will occur. *See* 8 U.S.C. § 1229a; *Padilla*, 559 U.S. at 365 (recognizing that removal is "civil in nature" and "not, in a strict sense, a criminal sanction"). With respect to both denaturalization and

23

deportation, the consequence is not imposed by the sentencing judge in the predicate criminal case.

Additionally, the government highlights the role that prosecutorial discretion plays in denaturalization proceedings, advising that it "rarely seeks denaturalization, even following criminal convictions." Gov't Br. at 18. But deportation proceedings, too, are initiated by the government through an "exercise of prosecutorial discretion . . . on a case-by-case basis . . . ." Mem. from Sec'y John Kelly, Dep't of Homeland Sec., *Enforcement of the Immigration Laws to Serve the National Interest* 4 (Feb. 20, 2017). Even once the government has placed a noncitizen in removal proceedings, removal is not an entirely foregone conclusion: the Attorney General retains "limited remnants of equitable discretion" to cancel removal, *Padilla*, 559 U.S. at 364, and certain individuals may avoid deportation if they can, for instance, convince their immigration judge that their conviction is not for a qualifying crime of moral turpitude, or establish eligibility for cancellation of removal. And deportation is not necessarily "immediate" in the temporal sense: it can occur long after a conviction renders the noncitizen eligible. *See Restrepo v. Att'y Gen. of U.S.*, 617 F.3d 787, 800–02 (3d Cir. 2010) (concluding that no statute of limitations applies to removal proceedings predicated on a conviction).

The government also contends that a conviction is not a necessary condition for denaturalization: it may obtain an order of denaturalization even without a criminal conviction, so long as it can prove that the defendant committed the underlying conduct that rendered his naturalization "illegally procured," or that the defendant lied about his conduct during the naturalization process, 8 U.S.C. § 1451(a). Again, the same is true of deportation. *See, e.g.*, *id.* § 1227(a)(1), (3)–(6) (providing numerous grounds for deportation not predicated on a criminal conviction). At oral argument in these en banc proceedings, in fact, the government conceded that the Sixth Amendment would apply with respect to counsel's advice to a noncitizen about entering a plea to a *non*removable

24

offense, where in the course of pleading guilty the defendant would admit to conduct that would make him removable. *See* En Banc Oral Arg. Tr. at 42:5–17. If that is so, we see no reason why, in cases involving the risk of denaturalization, the fact that the conviction itself would not serve as the predicate for denaturalization should remove advice about that consequence from the Sixth Amendment's ambit. In short, the government's asserted distinctions between deportation and denaturalization do not withstand scrutiny.

*Third*, the government's concession at oral argument regarding the applicability of *Padilla* to asylees underscores the weakness of its urged reading of *Padilla*. When asked whether *Padilla*'s holding applies to a noncitizen asylee who is exposed to the risk of deportation because of a criminal conviction, the government answered in the affirmative. *See* En Banc Oral Arg. Tr. at 52:7–8 ("Absolutely, your Honor. They're a noncitizen. *Padilla* applies to any noncitizen."). But the deportation risk faced by asylees who are deciding whether to enter a guilty plea is virtually indistinguishable from that faced by naturalized citizens confronted with the same choice. The path from conviction to removal for asylees, like that for naturalized citizens, comprises two steps: in the case of asylees, the government must first terminate their asylum status before it can remove them.[11]

The similarities between denaturalization and termination of asylum status do not end there. Just as a conviction is not a *necessary* condition for denaturalization (in the sense that an individual can be denaturalized based on conduct admitted to in a

---

[11] Asylees are subject to removal only after their asylum status has been terminated. *See* 8 U.S.C. § 1158(c)(1)(A) (stating that the Attorney General "shall not remove or return" a noncitizen granted asylum); *id.* § 1158(c)(2) (providing a mechanism for terminating asylum); *id.* § 1158(c)(3) (providing that a noncitizen whose asylum status is terminated is subject to any applicable grounds of inadmissibility or removal under 8 U.S.C. § 1182(a) and § 1227(a)).

guilty plea or on a lie about that conduct, even if the conviction itself is not a predicate for denaturalization), a conviction is also not a necessary condition for termination of asylum. The government can terminate asylum on grounds unrelated to a conviction.[12]

And as for the government's contention that a conviction is not a *sufficient* condition for denaturalization and removal, the same is also true for termination of asylum and removal. For example, the government posits that establishing at a denaturalization proceeding that nondisclosure or misrepresentation of a material fact during the naturalization process was "willful" might require an additional showing not already established by the criminal conviction.[13] In the case of asylees, however, to terminate an individual's asylum, the government must likewise prove more than the fact of a conviction of a qualifying crime: it must show that the asylee "constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii).[14] Accordingly, the government's concessions with respect to the Sixth Amendment duties owed asylees expose the same flaws in its contention that denaturalization is not a sufficiently automatic consequence of a guilty plea and conviction.

------

[12] *See id.* § 1158(b)(2)(A)(i), (iii)–(vi), (c)(2)(A)–(E).

[13] *See id.* § 1451(a); *Kungys*, 485 U.S. at 767; Gov't Br. at 19–20 ("[A]n inadvertent oversight or sincere failure of recollection in omitting the criminal conduct on a naturalization form would not have been a 'willful misrepresentation.'").

[14] In more detail: An individual's asylum-based status may be terminated if the noncitizen asylee, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States." 8 U.S.C. § 1158(b)(2)(A)(ii); *see also id.* § 1158(c)(2)(B) (identifying the conditions in § 1158(b)(2) as a basis for terminating asylum); *id.* § 1158(b)(2)(B)(i) (defining "particularly serious crime" to include an aggravated felony). Accordingly, in addition to establishing that the noncitizen has been convicted of a particularly serious crime, the government must also prove that the noncitizen "constitutes a danger to the community of the United States." *Id.* § 1158(b)(2)(A)(ii).

C.      The government's remaining arguments against applying *Padilla* to the risk of denaturalization and related deportation fail.

The government offers a host of other arguments in support of its position that *Padilla* should not apply to a client in Farhane's circumstances. None is convincing.

As an initial matter, we easily disavow any suggestion that *Padilla* protects only noncitizens. That the *Padilla* Court referred at points to "noncitizen defendants" and "noncitizen offenders," 559 U.S. at 364, 366, is unsurprising, since Padilla himself was a noncitizen. Notably, however, the Court in *Padilla* stated its holding in broad terms: "[W]e now hold that counsel must inform her *client* whether his plea carries a risk of deportation." *Id.* at 374 (emphasis added). And it stressed that "[i]t is our responsibility under the Constitution to ensure that no criminal defendant—*whether a citizen or not*—is left to the mercies of incompetent counsel." *Id.* (emphasis added) (internal quotation marks omitted). It seems to us perplexing and paradoxical, both, to construe *Padilla* as providing stronger protection to a *noncitizen* at risk of deportation (like Padilla) than to a *U.S. citizen* at risk of denaturalization followed by deportation (like Farhane).[15] Under the government's view, Farhane would have been better off had he never pursued naturalization: had he been merely a lawful permanent resident when he pleaded guilty, rather than a naturalized citizen, *Padilla* would settle that *Strickland* governed his ineffective assistance claim. *Cf. United States v. Winter*, 509 F.2d 975, 989 n.45 (5th Cir.

---

[15] Judge Walker's Dissent fails to address the apparent paradox that, under the government's and the prior panel majority's views, the Sixth Amendment would provide greater protection to a noncitizen faced with a risk of deportation than to a naturalized citizen also facing a risk of deportation. Indeed, it seems to us telling that it devotes much space to analyzing the deficient performance and prejudice prongs of *Strickland, see* Dissent (Walker, J.) at 9–21, rather than the merits of the Sixth Amendment claim. It does not face the puzzling situation its Sixth Amendment interpretation creates for criminal defense attorneys who would, under its view, be constitutionally required to advise only *some* of their immigrant clients about the immigration risks of a possible plea.

1975) ("We are unaware of any context . . . in which [a noncitizen] has greater rights under law in our Courts than an American citizen. Indeed, such a circumstance might in itself raise serious questions of equal protection.").

The government also maintains that the Sixth Amendment applies to affirmative misadvice regarding the risk of denaturalization but not to a wholesale failure to advise on that risk. But the Court roundly rejected an argument based on this very distinction in *Padilla* in terms equally apt here:

> A holding limited to affirmative misadvice would invite two absurd results. First, it would give counsel an incentive to remain silent on matters of great importance, even when answers are readily available. Silence under these circumstances would be fundamentally at odds with the critical obligation of counsel to advise the client of the advantages and disadvantages of a plea agreement. . . . Second, it would deny a class of clients least able to represent themselves the most rudimentary advice on deportation even when it is readily available.

559 U.S. at 370–71 (internal quotation marks omitted). We decline the government's invitation to adopt a rule that would lead to "absurd results," *id.* at 370, and that would incentivize counsel to remain silent when advice is most needed.

Nor do we agree with the government's suggestion that the rule we set forth today will call into question the applicability of the direct/collateral framework to ineffective assistance claims more broadly. As explained above, our conclusion here is dictated by *Padilla*'s holding that "advice regarding deportation is not categorically removed from the ambit of the Sixth Amendment right to counsel," even when "the deportation consequences of a particular plea are unclear or uncertain." *Id.* at 366, 369. The government recites a litany of other collateral consequences that it claims will by

28

virtue of our decision now fall in the Sixth Amendment's scope.[16] Virtually none of them, however, "carries a risk of deportation," the risk that the *Padilla* court held to be "unique." *Id.* at 365, 374. The government's argument therefore misses the mark.[17]

Next, like the Court in *Padilla*, we see no reason to expect that our decision today will open the floodgates to meritless challenges to long-final convictions. *See id.* at 371–72 (describing the "serious consideration" given to the concerns expressed "regarding the importance of protecting the finality of convictions obtained through guilty pleas" and nonetheless finding it "unlikely that our decision today will have a significant effect on those convictions already obtained as the result of plea bargains"). Any floodgates concerns here do not rest on solid ground. To start, the government has represented

---

[16] *See* Gov't Br. at 32 (listing as examples of other collateral consequences that would be called into question by virtue of a decision in Farhane's favor: "civil or criminal forfeiture, mandatory restitution, court martial or disqualification from the armed services, loss of . . . licenses granted by the state, loss of civil rights, loss of federal benefits, denial of certain types of employment, mandatory HIV testing, registration of sex offenders, use of the conviction in a subsequent civil or criminal case, and, for non-citizens, immigration consequences . . ." (internal quotation marks omitted)).

[17] With respect to the potential application of *Padilla*'s underlying reasoning to these other consequences, we stress the *Padilla* Court's characterization of deportation as "particularly severe," *id.* at 365, and the role that severity played in our analysis of denaturalization. Take civil forfeiture, one of the government's proffered examples. Although we do not decide this question today, it seems to us unlikely that civil forfeiture would come close to denaturalization and deportation in severity as well as irreversibility. As the Supreme Court has recognized, "denaturalization, like deportation, may result in the loss of all that makes life worth living." *Knauer v. United States*, 328 U.S. 654, 659 (1946) (internal quotation marks omitted); *see also Klapprott*, 335 U.S. at 612 (characterizing the loss of citizenship as "an extraordinarily severe penalty," one that cannot compare to "a mere money fine or a short imprisonment"); *Delgadillo v. Carmichael*, 332 U.S. 388, 391 (1947) (describing deportation as "the equivalent of banishment or exile"); *Schneiderman v. United States*, 320 U.S. 118, 122 (1943) (describing the benefits that derive from citizenship as "priceless," and characterizing the loss of citizenship as "more serious than a taking of one's property, or the imposition of a fine or other penalty"). The government has presented no instance in which civil forfeiture of assets meaningfully compares in permanence or familial consequences.

that it rarely seeks denaturalization, even following criminal convictions. *See* Gov't Br. at 18 (reporting that, based on its own review of dockets, just 228 denaturalization cases were filed nationwide between 2008 and 2020). In any event, the record offers no basis for estimating how many naturalized citizen defendants would even be eligible for denaturalization and deportation as a result of their guilty pleas. In addition, statutes of limitations and other constraints applicable to petitions for state and federal habeas and coram nobis relief can further be expected to reduce the likelihood that a flood will follow in this decision's wake. *See, e.g.*, 28 U.S.C. § 2255(f) (setting forth one-year statute of limitations, which runs from the latest of four dates, for § 2255 motions); *Jobe v. Comm'r of Corr.*, 224 A.3d 147, 159 (Conn. 2020) (concluding that "a petitioner whose conviction has expired fully prior to the filing of a habeas petition is not in 'custody' on that conviction within the meaning of [Connecticut's habeas statute]" (internal quotation marks omitted)); *State v. Grisgraber*, 439 A.2d 377, 379 (Conn. 1981) (stating that, in Connecticut, a writ of coram nobis "authorize[s] the trial judge, within three years, to vacate the judgment"); *People v. Friedgood*, 448 N.E.2d 1317, 1319 (N.Y. 1983) (finding no abuse of discretion in the trial court's denial of the defendant's motion to vacate his conviction under N.Y. Crim. Proc. Law § 440.10 where the defendant "waited for over three years to bring" his challenge). *But see In re D.C.*, 149 A.3d 466, 470 n.2 (Vt. 2016) (explaining that petitions for post-conviction relief "are not subject to a statute of limitations"); *Thompson v. Comm'r of Corr.*, 158 A.3d 814, 823 (Conn. App. 2017) (clarifying that there is no statute of limitations for a writ of habeas corpus in Connecticut). And the constitutional ruling on the Sixth Amendment's applicability to an ineffective assistance claim is only the threshold inquiry. It leads to a demanding analysis under *Strickland*, one that—the Court observed—rarely leads to overturning a conviction. *See Padilla*, 559 U.S. at 371–72 ("Surmounting *Strickland*'s high bar is never an easy task.").

Finally, the government's focus on the collateral estoppel effect of Farhane's plea and conviction is a red herring. *See, e.g.*, Gov't Br. at 17 ("The possibility of collateral estoppel in a civil denaturalization proceeding is a collateral consequence of a criminal conviction[.]"); *id.* at 28 (asserting that, even if Farhane's "criminal conviction would work to his detriment by virtue of collateral estoppel, . . . this Court has repeatedly held that collateral estoppel alone does not transform a collateral consequence into a direct one" (internal quotation marks omitted)). In reaching our conclusion today, we follow the *Padilla* Court's guidance by focusing instead on how Farhane's guilty plea carried the risk of adverse immigration consequences, specifically denaturalization and deportation. As we have already observed, the *Padilla* Court instructed that counsel must advise a client "that pending criminal charges may carry a risk of adverse immigration consequences." 559 U.S. at 369. Whether a conviction carries such a risk by virtue of collateral estoppel consequences or by serving as a predicate for the later immigration result is beside the point. Here, the government's denaturalization complaint expressly relied on Farhane's guilty plea, asserting that he "is collaterally estopped from contesting those matters determined by the judgment in the criminal case," and reminding the court that it was not free to take any related circumstances into account before entering a denaturalization order. App'x at 314. By making it substantially easier for the government to obtain Farhane's denaturalization, his guilty plea materially increased his risk of denaturalization and eventual deportation. Under *Padilla*, that is enough to trigger counsel's Sixth Amendment obligation to say *something* about the risk.

D.     The government forfeited its *Teague* argument.

The government also now contends that *Teague v. Lane*, 489 U.S. 288 (1989), precludes us from addressing Farhane's Sixth Amendment arguments. But the government forfeited their argument. As the original panel Majority observed, the

31

government "did not make this argument in the district court" and still has "offered no justification for the omission." *Farhane*, 77 F.4th at 126 n.4.

What is more, the government failed to raise *Teague* at the first opportunity it had in *this* Court, in its opposition to Farhane's request for a certificate of appealability. It was not until the appeal merits briefing stage—after a three-judge panel had already heard argument on Farhane's motion for a certificate of appealability and granted it—that the government mentioned *Teague* for the first time. The government has therefore forfeited its *Teague* argument, and we are under no obligation to consider it. *See, e.g., Collins v. Youngblood*, 497 U.S. 37, 41 (1990) (instructing that *Teague* "is not 'jurisdictional' in the sense that [courts] . . . *must* raise and decide the issue *sua sponte*" (emphasis in original)); *Young v. Conway*, 698 F.3d 69, 86 (2d Cir. 2012) (noting that courts "have the discretion, but are by no means required, to address [*Teague*] defenses for the first time on appeal").

Although it is true that we may nonetheless exercise our discretion to consider the application of *Teague* to our holding today, the government does not offer any compelling reason why we should do so. In fact, the government's still-unexplained delay in raising the issue weighs heavily against the notion. If we were to consider and find persuasive the government's "eleventh-hour *Teague* argument" now, Farhane's Sixth Amendment contentions—the issues that the panel that granted Farhane a certificate of appealability, the panel that originally decided his appeal, and a majority of the en banc Court all "thought worthy of review"—"would be insulated from our consideration." *Buck v. Davis*, 580 U.S. 100, 127–28 (2017). We therefore decline to consider the government's forfeited *Teague* argument.

\*　　\*　　\*

32

In sum, we conclude that criminal defense counsel has a Sixth Amendment obligation to inform a client that his plea carries a risk of serious adverse immigration consequences: here, of denaturalization and related deportation. *Padilla* dictates this result.

**II.     We remand Farhane's case to permit the District Court to conduct a *Strickland* analysis in accordance with the Sixth Amendment understandings we reach.**

Having established that the Sixth Amendment requires counsel to advise naturalized citizen clients of the risk of denaturalization and deportation arising from a guilty plea, the next step is consideration of the merits of Farhane's claim that his counsel's failure to do so in 2006 constituted ineffective assistance. To establish that his counsel was constitutionally ineffective, Farhane must show that (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "any deficiencies in counsel's performance [were] prejudicial to the defense." *Strickland*, 466 U.S. at 688, 692.

A.     The District Court should reevaluate whether Farhane's counsel's performance was objectively unreasonable under professional norms prevailing in 2006.

Under *Strickland*'s first prong, the defendant must show that his lawyer's performance "falls outside the 'wide range of professionally competent assistance.'" *Kovacs v. United States*, 744 F.3d 44, 50 (2d Cir. 2014) (quoting *Strickland*, 466 U.S. at 690). To assess objective reasonableness, we evaluate "prevailing professional norms" at the time of representation, using "American Bar Association ["ABA"] standards and the like [as] guides to determining what is reasonable." *Padilla*, 559 U.S. at 366 (internal quotation marks and alterations omitted).

Here, in concluding that Farhane failed to establish that his counsel's performance was objectively unreasonable, the District Court's reasoning cannot be

squared with *Padilla*. In its analysis, the District Court relied principally on the fact that, because Farhane "was a U.S. citizen at the time of his plea," his conviction did not create an "imminent risk of deportation." *Farhane*, 2020 WL 1527768, at *2. But by requiring Farhane to show that his conviction gave rise to an *imminent* risk of deportation, the District Court impermissibly narrowed *Padilla*. As explained above, the Supreme Court held in *Padilla* that counsel must inform her client "whether his plea carries a *risk* of deportation." 559 U.S. at 374 (emphasis added). It stressed that counsel's duty to advise her client about the risk of deportation applies whenever that risk exists, not solely when that risk is imminent or crystal clear. *See id.* at 369 & n.10 (explaining that lack of clarity in the law affects only the scope and nature of the advice counsel has a duty to provide, not whether counsel has such a duty at all). The District Court, in focusing only on an "imminent risk of deportation," *Farhane*, 2020 WL 1527768, at *2, therefore assessed the objective reasonableness of counsel's performance in the first instance using an incorrect understanding of *Padilla*.

Accordingly, we remand for the District Court to reevaluate whether Farhane's counsel's failure to advise was objectively reasonable. The correct question—and the one that the District Court should answer on remand—is whether prevailing professional norms in 2006, when Farhane pleaded guilty, required defense counsel to advise naturalized citizen clients of the risk of denaturalization and deportation stemming from entry of a guilty plea.[18] In determining what was reasonable in 2006, it

---

[18] We note that the defendant whose guilty plea was at issue in *Padilla* was counseled and entered his guilty plea in 2002—four years before Farhane pleaded guilty. *See Padilla v. Commonwealth*, 381 S.W.3d 322, 324 (Ky. Ct. App. 2012). The Supreme Court in *Padilla* reviewed "authorities of every stripe" before concluding that "[t]he weight of prevailing professional norms supports the view that counsel must advise her client regarding the risk of deportation." 559 U.S. at 367 (internal quotation marks and alterations omitted). It emphasized that professional norms had imposed such a duty on defense counsel "[f]or at least the past 15 years"—that is, since at least 1995. *Id.* at 372.

should consult ABA standards and similar materials, which "may be valuable measures of the prevailing professional norms of effective representation"—but "are only guides, . . . and not inexorable commands." *Padilla*, 559 U.S. at 366–67 (internal quotation marks omitted).

Farhane's trial counsel should also have an opportunity to be heard. The District Court denied Farhane's § 2255 petition without an evidentiary hearing, and so counsel had no opportunity either to describe or to explain his conduct: we have Farhane's account, through his affidavit, but not counsel's. Our "usual practice" is "to remand *Strickland* cases to the district court to permit the attorney in question to testify and explain h[is] actions." *Jackson v. Leonardo*, 162 F.3d 81, 86 (2d Cir. 1998); *see also Sparman v. Edwards*, 154 F.3d 51, 52 (2d Cir. 1998) ("[A] district court facing the question of constitutional ineffectiveness of counsel should, except in highly unusual circumstances, offer the assertedly ineffective attorney an opportunity to be heard and to present evidence, in the form of live testimony, affidavits, or briefs."). We see no reason to depart from that practice here. And Farhane may be heard in person, too, instead of solely by affidavit.

To clarify: on remand, the District Court should determine whether Farhane's counsel's performance *in 2006* was objectively unreasonable by analyzing relevant authorities on professional norms and providing Farhane's trial counsel with an opportunity to speak.

B. <u>The District Court should address in the first instance whether Farhane established prejudice.</u>

Under *Strickland*'s second prong—prejudice—the defendant must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Padilla*, 559 U.S. at 366 (quoting *Strickland*, 466 U.S. at 694). In the plea context, "we do not ask whether, had he gone to trial, the result

of the trial would have been different than the result of the plea bargain." *Lee*, 582 U.S. at 364 (internal quotation marks omitted). Instead, we consider whether the defendant has demonstrated a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Id.* at 364–65 (quoting *Hill v. Lockhart*, 474 U.S. 52, 59 (1985)); *see also Kovacs*, 744 F.3d at 52 (concluding that prejudice also exists if the defendant can show that "there was a reasonable probability that [he] could have negotiated a plea that did not impact [his] immigration status").

We decline to determine the prejudice question as to Farhane now.[19] The Supreme Court has emphasized that determining "what an individual defendant would have done" as part of the prejudice inquiry "demands a case-by-case examination of the totality of the evidence." *Lee*, 582 U.S. at 367–68 (internal quotation marks omitted). In the District Court, Farhane did not have a robust opportunity to develop a relevant record nor did the government have a chance to rebut it. On remand, both will have that opportunity, and further, the District Court will be positioned to assess the credibility of Farhane's assertion that, had he been properly advised, he would have insisted on proceeding to trial.[20] *See, e.g.*, *Padilla*, 559 U.S. at 369 ("Whether Padilla is entitled to relief on his claim will depend on whether he can satisfy *Strickland*'s second

---

[19] The District Court should consider, among other things, whether Farhane might have "placed particular emphasis on immigration consequences in deciding whether or not to plead guilty," *Doe v. United States*, 915 F.3d 905, 911 (2d Cir. 2019) (quoting *Kovacs*, 744 F.3d at 52) (alterations adopted)—enough to forgo the ten-year reduction in his maximum possible sentence that resulted from his entry of a guilty plea.

[20] Farhane additionally argues that he could have presented viable defenses at trial, and that his trial counsel could have "leveraged" these defenses "to negotiate an alternative plea deal that foreclosed the risk of denaturalization and deportation." Farhane Br. at 51; *see also id.* at 46–49 (contending that he could have challenged the credibility of the government's "key witness" at trial); *id.* at 49–51 (asserting that he could have mounted an entrapment defense). Unsurprisingly, the government disputes these contentions. We express no view on these issues here; on remand, the District Court may consider these arguments as it sees fit.

prong, prejudice, a matter we leave to the Kentucky courts to consider in the first instance."); *Rodriguez v. United States*, 730 F. App'x 39, 44 (2d Cir. 2018) (finding it "not clear on this record whether Rodriguez would have proceeded to trial had she known she could face denaturalization" and remanding "for the district court to develop a fuller record concerning the issue of prejudice").

\* \* \*

For the reasons stated above, we remand to the District Court to permit it to make fresh determinations on both prongs of the *Strickland* inquiry after allowing the parties to develop the relevant records and conducting an evidentiary hearing as appropriate.[21]

## CONCLUSION

For the foregoing reasons, we **VACATE** the decision of the prior panel Majority; **VACATE** the judgment of the District Court; and **REMAND** the case for further proceedings consistent with this opinion.

---

[21] Of course, "there is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697.

WESLEY, *Circuit Judge*, joined by LEE, ROBINSON, NATHAN, and MERRIAM, *Circuit Judges*, concurring:

A number of my colleagues endorse what was my initial view of this case. I respect their position in this difficult matter, but I have come to disagree with that view. I join the majority opinion to vacate and remand.

Farhane's guilty plea admitted to criminal activity that preceded his U.S. citizenship and was not revealed in his naturalization process. His plea, entered 18 years ago, now endangers his U.S. citizenship and eligibility to remain in this country. Only after Farhane was released from prison did the Government initiate civil denaturalization, invoking the estoppel of Farhane's long ago plea admissions. "[O]nce his citizenship is revoked, Farhane will be subject to removal as a noncitizen convicted of an aggravated felony."[1] Maj. Op. at 18. Farhane's 2006 guilty plea therefore carried a risk of "adverse immigration consequences,"

---

[1] Farhane and the Government agree that, if denaturalized, Farhane is removable under the Immigration and Nationality Act ("INA")'s aggravated felony provision. Appellant's Br. at 23; En Banc Oral Arg. Tr. at 51:5–7. Like the majority, I therefore assume the same. At argument, the Government remarked that the Third and Eleventh Circuits, reviewing decisions of the Board of Immigration Appeals, have held that a noncitizen is not removable under the INA's aggravated felony provision if they were a U.S. citizen at the time of conviction. En Banc Oral Arg. Tr. at 50:4–15 (citing *Singh v. Att'y Gen. of U.S.*, 12 F.4th 262 (3d Cir. 2021); *Hylton v. U.S. Att'y Gen.*, 992 F.3d 1154 (11th Cir. 2021)). This Court has yet to reach the issue and cannot here. However, Farhane's counsel confirmed that, even if the aggravated felony provision did not apply, once denaturalized, Farhane would still be deportable on other grounds. *Id.* at 77:24–78:3. In any event, *Padilla* applies even when a plea's deportation risk is "unclear or uncertain." *Padilla v. Kentucky*, 559 U.S. 356, 369 (2010).

including "deportation," and *Padilla* teaches that, under the Sixth Amendment, counsel must advise her client of that risk. *Padilla v. Kentucky*, 559 U.S. 356, 369, 374 (2010).

The Government contends that *Padilla* does not impose a Sixth Amendment concern with regard to that risk here because, unlike the noncitizen in *Padilla*, Farhane is a naturalized citizen; his denaturalization and subsequent deportation are dependent on a "rare, contingent risk that a separate civil denaturalization proceeding could be initiated." Gov't Br. at 30. The dissent agrees, concluding that "*Padilla*'s core reasoning does not apply in Farhane's case, in which the preexisting denaturalization risk was independent of and at most collateral to his conviction and any deportation risk was entirely dependent on Farhane first becoming denaturalized." Dissent (Walker, *J.*) at 9.

The snag in that conclusion, as I see it now, is that asking whether Farhane, regardless of his conviction, could be denaturalized, is the wrong way to assess the immigration implications of his conviction. No doubt, the Government could have sought to denaturalize Farhane with or without his conviction. However, Farhane's conviction, for pre-naturalization conduct, weakens his defense to denaturalization; and, his conviction, to the type of crimes here, separately

2

guarantees that, upon his denaturalization, he will be deported.[2]  *See* Maj. Op. at 16–18.  There is no doubt a significant connection between his criminal activity, his naturalization status, and his continued presence in the United States.

Consider the following: what if the Government had initiated denaturalization proceedings before (instead of after) Farhane's plea?  Would the dissent say, even then, with the Government having revealed its intent to denaturalize Farhane, that his counsel need not have warned him of the denaturalization and deportation risks of pleading guilty in his criminal case?  Nothing about *Padilla* mandates that we leave naturalized citizens with Sixth Amendment rights uniquely dependent on the Government's whim, at best, or manipulation, at worst.[3]  Nor does *Padilla* suggest that we should.

For the reasons thoroughly discussed by the majority opinion, the differences between the deportation risk connected to a noncitizen's guilty plea, as in *Padilla*, and the coupled denaturalization and deportation risk resulting from a naturalized citizen's guilty plea, as that here, fail to convince that the Sixth

---

[2] *See supra* at 1 n.1.

[3] At least one Circuit has concluded that there is no statute of limitations for removal proceedings predicated on a conviction, or for civil denaturalization.  *See United States v. Phattey*, 943 F.3d 1277, 1279 (9th Cir. 2019) (concluding that the five-year statute of limitations generally applicable to civil penalties does not apply to civil denaturalization); *Restrepo v. Att'y Gen. of U.S.*, 617 F.3d 787, 800–02 (3d Cir. 2010) (concluding that the federal "catch all" statute of limitations does not apply to removal proceedings predicated on a conviction).

Amendment requires counsel to warn of the former, but not the latter. *See* Maj. Op. at 16–20, 27–28.

The majority recognizes that the precise likelihood of deportation following a naturalized citizen's guilty plea may be more difficult to assess than that of most noncitizens, but *Padilla* explains that the Sixth Amendment requires counsel to advise of a plea's "risk of adverse immigration consequences," even where "the deportation consequences of a particular plea are unclear or uncertain." *Padilla*, 559 U.S. at 369; *see* Maj. Op. at 19–20. *Padilla* does not suggest that the Supreme Court had canvassed the entire federal code and every immigration hypothetical to confirm that *Padilla* arose out of the one and only set of factual circumstances in which a guilty plea could carry an immigration risk giving rise to Sixth Amendment concerns.

Instead, the Supreme Court made clear that, when it comes to deportation, the direct/collateral framework is not the measuring stick for the Sixth Amendment's reach. Under the direct/collateral framework, "[d]eportation as a consequence of a criminal conviction is, because of its close connection to the criminal process, uniquely difficult to classify as either a direct or a collateral consequence." *Padilla*, 559 U.S. at 366. Indeed, "deportation, because the

4

consequence of a distinct civil proceeding, could well be viewed as [a collateral] matter" of no Sixth Amendment concern. *Chaidez v. United States*, 568 U.S. 342, 352 (2013). The Supreme Court concluded that "[t]he collateral versus direct distinction is thus ill suited to . . . the specific risk of deportation." *Padilla*, 559 U.S. at 366. It is because deportation "is a 'particularly severe' penalty, and one 'intimately related to the criminal process,'" not because it is a so-called direct consequence, that the Sixth Amendment requires counsel to warn of it. *Chaidez*, 568 U.S. at 352 (quoting *Padilla*, 559 U.S. at 365). After all, if deportation were completely, not "nearly" automatic, *Padilla*, 559 U.S. at 366, the direct/collateral framework would have easily deemed it a direct consequence; the Supreme Court would have had no need to decide *Padilla*.

Here, the test for determining whether *Padilla* applies should not functionally reimpose the direct/collateral framework that *Padilla* explicitly set aside. The Government's argument for why *Padilla* does not apply to Farhane's case merely establishes that, if the direct/collateral framework were to apply, Farhane's denaturalization and subsequent deportation could be viewed collateral to his plea. That is not enough to distinguish *Padilla*.

Although the denaturalization and deportation risk posed by Farhane's plea raises a Sixth Amendment concern under *Padilla*, the *degree of risk* remains highly relevant to the Sixth Amendment analysis under *Strickland v. Washington*, 466 U.S. 668 (1984). In other words, if a naturalized citizen's guilty plea poses a risk of denaturalization and deportation like Farhane's here, arguments about the likelihood or certainty that his conviction will result in the realization of that risk will be considered at a different step of the Sixth Amendment framework: during the court's *Strickland* analysis.[4]

For this reason, I agree with the majority that, as in *Padilla*, *Strickland* prevents opening the "floodgates to meritless challenges" that some of my colleagues fear.[5] Maj. Op. at 29–30; *see* Dissent (Park, *J.*) at 6–7; *see also Padilla*, 559 U.S. at 371–72. For example, if a naturalized citizen pleaded guilty to an undisclosed pre-naturalization crime, as here, but denaturalization and deportation were unlikely—perhaps the crime was not of a type for which the Government was generally seeking denaturalization or was a tenuous basis for

---

[4] In my view, unlike *Padilla*'s more amorphous analysis, *Strickland*'s clear, two-part test is much better equipped to tackle the intensely factual and particularized evaluation of the exact level of immigration risk posed by a plea.

[5] As the majority observes, if there were, as the Government says, only 228 denaturalization cases filed between 2008 and 2020, how deep are the flood waters? *See* Maj. Op. at 29–30 (citing Gov't Br. at 18). I concede that changes to executive branch policy could perhaps raise the tide, but *Strickland* should prove an adequate levee.

6

deportation—then the court might conclude that the immigration risk carried by the conviction was so low that it was outside the norms for counsel to consider, or, that even if counsel had warned of it, there was no reasonable probability that he would have rejected the plea.

This case presents a convergence of facts that make the *Strickland* analysis more challenging: Farhane pleaded guilty to crimes that would clearly render a noncitizen deportable; some of the criminal activity occurred before he became a U.S. citizen and was not disclosed before his naturalization; and the criminal activity was of a type that may have made it more likely that the Government would seek his denaturalization. The majority wisely exercises restraint in remanding for the district court to conduct the *Strickland* analysis, now with the guidance of our decision, and to develop the factual record if needed. *See* Maj. Op. at 33–37; *see also* Concurrence (Pérez, *J.*) at 12 ("It is not the job of this Court to conduct this analysis without giving the parties the opportunity to develop the record."); Dissent (Nardini, *J.*) at 1 (reasoning that "the district court should undertake that analysis in the first instance").

Lastly, a word or two on *Teague*—the one issue on which the original panel was unanimous. *See Farhane v. United States*, 77 F.4th 123, 126 n.4 (2d Cir. 2023)

(citing *Teague v. Lane*, 489 U.S. 288, 316 (1989)).  We agreed, as the majority does now, that the Government had forfeited a *Teague* defense, and that we should decline to resurrect it.[6]

Some of my dissenting colleagues now suggest that we should excuse the Government's forfeiture and embrace *Teague* here, presenting their view as an exercise of judicial restraint and constitutional avoidance.  Dissent (Park, *J.*) at 1, 4–5.  Unfortunately, it is not.

In *Teague*, the Supreme Court announced that "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced."  *Teague*, 489 U.S. at 310.  In other words, "new constitutional rules of criminal procedure will not be announced or applied on collateral review."  *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993).  However, *Teague* is not "jurisdictional."  *Collins v. Youngblood*, 497 U.S. 37, 41 (1990).  The Supreme Court "ha[s] held that States can waive a *Teague* defense, during the course of litigation, by expressly choosing not to rely on it, or by failing to raise it

---

[6] My colleagues note that "forfeited," not "waived," is the appropriate term here.  Dissent (Park, *J.*) at 4 n.1.  In adopting "forfeited," I do not suggest that the Government's previous silence on *Teague* was not knowing and intelligent.  As the majority correctly observes, the Government has never explained why it did not earlier raise *Teague*.  *See* Maj. Op. at 31–32 (citing *Farhane v. United States*, 77 F.4th 123, 126 n.4 (2d Cir. 2023)).

in a timely manner." *Danforth v. Minnesota*, 552 U.S. 264, 289 (2008) (internal citations omitted).

To be clear, because the Government undisputedly never raised a *Teague* defense in the district court—first raising it in this Court, and only after we granted a certificate of appealability—the Government forfeited the defense, and the Supreme Court's retroactivity doctrine bars no aspect of the majority's opinion. The finality interests served by *Teague* are insufficient to render its commands absolute. *See id.*; *Collins*, 497 U.S. at 41. Forfeited, as here, *Teague* bars nothing.

True, we have discretion to excuse the Government's forfeiture of *Teague*. *See Buck v. Davis*, 580 U.S. 100, 127 (2017). But there is no persuasive reason to do so here. At the outset, this is not a case in which the finality interests weigh strongly in favor of excusing forfeiture. My colleagues claim that the "interest in finality is particularly salient here" because of the age of Farhane's conviction and the potential evidentiary issues that make re-trying old offenses difficult. Dissent (Park, *J.*) at 6. However, this case does not involve a defendant challenging an old conviction while he has years of imprisonment left to serve, a circumstance in which the Government's ability to re-prosecute is of heightened concern. Farhane has completed his term of imprisonment and been released. Even if Farhane's

9

conviction were vacated, the most severe direct consequence of his conviction—his term of imprisonment—will remain irreversible.

I add that, in this case, any threat to finality is a problem of the Government's own making. It was the Government's decision, and its alone, to wait 18 years after Farhane's plea to initiate denaturalization proceedings. If the Government had earlier revealed its intent to denaturalize and deport Farhane, he would have long ago learned of those consequences of his plea. Instead, the Government sat idle. And then, when Farhane filed his 28 U.S.C. § 2255 motion, does the Government raise *Teague*? No.

Regardless, even if we were to excuse the Government's forfeiture, *Teague*'s retroactivity rule, in this case, would pose no simple bar. As we all recognize, because *Padilla* was decided *before* Farhane's conviction became final, *Padilla*, in this case, is not retroactive. *See Beard v. Banks*, 542 U.S. 406, 411 (2004) (defining finality for retroactivity purposes). The only way *Teague* could bar Farhane's ineffective assistance claim is if we not only excused the Government's forfeiture, but also decided that applying *Padilla* here, to conclude that the Sixth Amendment required counsel to advise of the risk in this case, would itself announce a new constitutional rule of criminal procedure.

10

Deciding that question—whether Farhane, by invoking *Padilla*, asks us to announce a new rule—presents no opportunity for judicial restraint or constitutional avoidance. The question may be framed in procedural terms, but the answer turns on substance. "'A case announces a new rule . . . when it breaks new ground or imposes a new obligation' on the government." *Chaidez*, 568 U.S. at 347 (alterations accepted) (quoting *Teague*, 489 U.S. at 301). We "announce[] a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final," meaning it would not "have been apparent to all reasonable jurists." *Id.* (internal quotation marks and citations omitted). Importantly, however, "a case does *not* 'announce a new rule, when it is merely an application of the principle that governed' a prior decision to a different set of facts." *Id.* at 347–48 (alterations accepted) (quoting *Teague*, 489 U.S. at 307). This is why "garden-variety applications of the test in *Strickland*, for assessing claims of ineffective assistance of counsel do not produce new rules." *Id.* at 348. "[W]hen all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes." *Id.*

These intricate standards offer no chance to avoid the substance of *Padilla* and its Sixth Amendment implications here. If *Padilla* had been decided *after*

11

Farhane's conviction became final, then excusing the Government's forfeiture of *Teague* would have offered the opportunity for constitutional avoidance that some of my colleagues seek. *See id.* at 358 (holding that *Padilla* "announced a new rule"). In those circumstances, at least post-*Chaidez*, the *Teague* analysis would have amounted to a quick confirmation of dates. Here, though, where excusing the Government's forfeiture leads us only to questions of what a constitutional decision like *Padilla* dictates, or to what kinds of facts it was meant to address— questions that ultimately determine the Sixth Amendment's present reach—we do not have that opportunity.[7]

There is no avoiding the constitutional question here. "The right of one charged with crime to counsel may not be deemed fundamental and essential to fair trials in some countries, but it is in ours." *Gideon v. Wainwright*, 372 U.S. 335,

---

[7] My colleagues contend that the majority's application of *Padilla* announces a new constitutional rule of criminal procedure for purposes of *Teague*. Dissent (Park, *J.*) at 1. I note that their conclusion may affect our general preference that defendants raise ineffective assistance claims, often dependent on evidence outside the record, on collateral, not direct, review. *See United States v. Doe*, 365 F.3d 150, 154–56 (2d Cir. 2004); *see also Massaro v. United States*, 538 U.S. 500, 504 (2003). The Supreme Court has made clear that "appl[ying] *Strickland*'s general standard to yet another factual situation" does not announce a new rule. *Chaidez v. United States*, 568 U.S. 342, 348–49 (2013). Therefore, we have generally not had to worry that if we decline to hear an ineffective assistance claim (based on *Strickland*) on direct appeal, we permit the Government to then bar that claim by raising *Teague* on collateral review. Given that some may conclude that applying *Padilla* in certain circumstances amounts to announcing a new rule for purposes of *Teague*, we may wish to consider that factor when deciding whether to hear, on direct appeal, ineffective assistance claims that invoke *Padilla*.

344 (1963). *Padilla* tells us that, when defendants "face possible exile from this country," we cannot apply the direct/collateral framework without eroding that right, a right our country extends to all, regardless of citizenship or path to citizenship. *See Padilla*, 559 U.S. at 370. Farhane's case is different from *Padilla*, but not in a way that asks for a different approach to understanding what the Sixth Amendment owes the accused. I vote to vacate and remand.

PÉREZ, *Circuit Judge*, joined by LEE, ROBINSON, NATHAN, and MERRIAM, *Circuit Judges*, concurring:

*Padilla v. Kentucky* stood for a simple proposition: to provide effective assistance under the Sixth Amendment, "counsel must inform her client whether his plea carries a risk of deportation." 559 U.S. 356, 374 (2010). *Padilla* and its progeny recognize no exceptions to this rule. Yet the government here asks us to exclude a sweeping class of people from *Padilla*'s holding: naturalized citizens. The majority opinion rightly declines to do so.

*Padilla*'s reasoning was powerful in its simplicity: deportation is a severe penalty, and the risk of deportation increases when certain defendants plead guilty to certain offenses. *See id.* at 364. Before assuming such a risk, those defendants must be apprised of it by their lawyers. *See id.* at 374. While I concur in full in the majority opinion, I write separately to emphasize that this case breaks no new ground—all of the pertinent legal questions in this case were asked and answered in *Padilla*, including the professional norms expected of Farhane's counsel at the time of Farhane's guilty plea.

## I.    *Padilla* Controls This Case.

As amply and ably explained by the majority opinion and Judge Wesley's concurrence, *Padilla* and its progeny carve out no exceptions as to when *Padilla*'s

protections apply or whom it protects:  when a guilty plea increases a defendant's risk of deportation, every defendant, no matter their citizenship status, must be informed of that risk.

Of course, it is correct that there are a number of important consequences of a guilty plea about which lawyers are not constitutionally required to warn their clients.  *See* Walker Dissenting Op. at 2 n.2.  But those circumstances have no bearing on this matter because the Supreme Court already determined that deportation is different.   Noting the severity of deportation, the *Padilla* Court described it as "the equivalent of banishment or exile."  *Padilla*, 559 U.S. at 373 (quoting *Delgadillo v. Carmichael*, 332 U.S. 388, 390–91 (1947)).  This logic is in line with long-standing Supreme Court precedent reinforcing the seriousness of subjecting any individual to possible removal from this country.  *See Knauer v. United States*, 328 U.S. 654, 659 (1946) ("For denaturalization, like deportation, may result in the loss of all that makes life worth living.") (internal quotation marks and citation omitted)).  It is the severity of the potential outcome and the uniqueness of deportation that "underscores how critical it is for counsel to inform [their] . . . client that he faces a risk of deportation."  *Padilla*, 559 U.S. at 373–74.

One dissenting opinion essentially asks this Court to invent a "closely tied" test to govern when a lawyer has a duty to inform a client about a deportation possibility after a criminal plea. Walker Dissenting Op. at 9. But *Padilla* does not call on us to do so. Rather, the Court acknowledged that deportation risks resist neat classification as either "direct" or "collateral" consequences of a guilty plea. That is, counsel's obligations under *Padilla* are not governed by an analysis of how many steps there are from criminal plea to deportation. Instead, the *Padilla* Court set forth a binary inquiry when the client is considering a guilty plea: does the plea increase the risk of deportation?

Certainly, the *Padilla* Court did explain that the connection between certain offenses and deportation muddies the distinction between direct and collateral consequences. *See* 559 U.S. at 366. But it is the very muddiness of the tie that explains why it is nonsensical to treat clients who must be denaturalized before deportation differently from those who were never naturalized, or to focus on how many steps exist between the guilty plea and deportation.[1]

---

[1] Further, in certain cases, a conviction *requires* the sentencing court to denaturalize the defendant. *See* 8 U.S.C. § 1451(e) ("When a person shall be convicted under section 1425 of title 18 of knowingly procuring naturalization in violation of law, the court in which such conviction is had shall thereupon revoke, set aside, and declare void the final order admitting such person to citizenship, and shall declare the certificate of naturalization of such person to be canceled. Jurisdiction is conferred on the courts having jurisdiction of the trial of such offense to make such adjudication.").

In sum, the distinctions a dissenting opinion is asking this Court to draw would mean defense counsel would never be required to warn naturalized citizens of any risk of deportation. This even includes situations where defense counsel knew there was little doubt that deportation would follow, like in cases where an individual will be left without a lawful immigration status after denaturalization. This result is unsupportable under *Padilla*.

## II.   *Teague* **Does Not Apply Because This Case Establishes No New Rule.**

As discussed both in the majority opinion and Judge Wesley's concurring opinion, the rule set forth in *Padilla* was clear. Since the risk of denaturalization is a risk of deportation, no new rule is needed to reach a decision in this case. *See Chaidez v. United States*, 568 U.S. 342, 347 (2013) ("A case announces a new rule . . . when it breaks new ground or imposes a new obligation on the government." (internal quotation marks and citation omitted)). And absent a new rule, *Teague v. Lane*, 489 U.S. 288 (1989), is inapplicable. *See* 489 U.S. at 299 (holding that a new rule of criminal procedure should not be applied retroactively to cases on collateral review).

The majority opinion concluded that the government forfeited any *Teague* argument. I have no qualms with that conclusion. I note, however, that even if we were to consider the *Teague* argument, Farhane has the better of the

4

debate. Contrary to the assertion in one of the dissenting opinions, *see* Park Dissenting Op. at 1–3, for the purposes of *Teague*, "a case does *not* announce a new rule, when it is merely an application of the principle that governed a prior decision to a different set of facts." *Chaidez*, 568 U.S. at 347–48 (internal quotation marks and citation omitted). That dissenting opinion overreads the "all reasonable jurists" standard observed in *Chaidez* and other cases when implying that *Teague* applies when there is even a *suggestion* that a rule may be novel. *See* Park Dissenting Op. at 2. In practice, the Supreme Court has found that a rule breaks new ground where, for example, it contradicts uniform practice, *see Chaidez*, 568 U.S. at 353–54, or where the courts of appeals have taken "differing positions," *Butler v. McKellar*, 494 U.S. 407, 415 (1990). These circumstances are not present here. Rather, with respect to Farhane's case, "all we do is apply a general standard to the kind of factual circumstances it was meant to address." *Chaidez*, 568 U.S. at 348; *see also Stringer v. Black*, 503 U.S. 222, 228–29 (1992) (explaining that "it would be a mistake to conclude" that a holding in a previously decided case "was limited" to the precise facts of that prior case).

**III.   Failure to Advise Farhane of the Risk of Deportation Satisfies the Deficient Performance Prong of *Strickland v. Washington.***

This Court correctly remands to the district court the question of whether Farhane's trial counsel rendered ineffective assistance per the first prong of the two-pronged analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). But I believe *Padilla* makes the district court's task on remand easier than the majority opinion suggests because the *Padilla* Court already told us what constitutes deficient performance per *Strickland*: failing to advise Farhane of his deportation risks.

**A.   The *Padilla* Court Determined the Relevant Professional Norms Applicable in Farhane's Case.**

The deficient performance prong of *Strickland* asks whether counsel's representation "fell below an objective standard of reasonableness." *Id.* at 688. Reasonableness is dictated by prevailing professional norms at the time of the representation. *See id.*

When the *Padilla* Court ruled on the professional norms in existence in 2002, it helped clarify what norms already existed by the time Farhane's counsel advised Farhane in 2006.

In determining the professional norms and conduct applicable at the time of Padilla's 2002 guilty plea, the *Padilla* Court relied on authorities that studied professional norms and conduct from as early as 1995. *See* 559 U.S. at 367. For example, it looked to a publication from 1997 that emphasized the need for defense counsel to "advise the defendant of . . . [a]ll of the consequences and ramifications of a particular plea, including possible . . . effects on . . . immigration status." G. Nicholas Herman, Plea Bargaining § 3.03, p. 20–21 (1997). It also relied on the 1999 American Bar Association Standards for Criminal Justice, which called on counsel to be "familiar with the basic immigration consequences that flow from different types of guilty pleas" and to "keep this in mind in investigating law and fact and advising the client." *ABA Standards for Criminal Justice: Pleas of Guilty*, Commentary to Standard 14-3.2(f) (3d ed. 1999). [2]

The *Padilla* Court pointed not only to outside authorities, but also to its own 2001 decision in *INS v. St. Cyr*, where it emphasized the importance of considering immigration consequences when deciding whether to accept a guilty plea. *See*

---

[2] Additionally, Farhane's counsel at oral argument pointed to a 2003 publication titled "Criminal Defense of Immigrants" which raised that a denaturalization risk could arise "from post-naturalization pleas to pre-naturalization conduct." May 22, 2024 Hr'g Tr. 5:14–18. This source is also cited by *Padilla* in its discussion of applicable professional norms. *See* 559 U.S. at 368.

7

*Padilla*, 559 U.S. at 368. In *St. Cyr*, the Supreme Court cited a 1999 publication on Criminal Defense Techniques which indicated that "[p]reserving [a] client's right to remain in the United States may be more important to the client than any potential jail sentence." *INS v. St. Cyr*, 533 U.S. 289, 322 (2001) (quoting 3 Bender, *Criminal Defense Techniques* §§ 60A.01, 60A.02[2] (1999)).

After this thorough survey of contemporaneous professional norms and conduct, the *Padilla* Court determined that, since at least 1995, counsel had to inform clients of the risk of deportation, and because Padilla's lawyer had not, the deficient performance prong of *Strickland* was met. By remanding only on the second prong of *Strickland*, the *Padilla* Court made unequivocally clear that the professional norms at the time Padilla entered his plea required counsel to advise their client on any deportation risks that accompany a guilty plea. *See* 559 U.S. at 367–69.

Farhane's guilty plea was entered four years after Padilla's guilty plea. Given the timing of Padilla and Farhane's respective guilty pleas, the prevailing professional norms determined by the *Padilla* Court had been in force for four more years. To conclude that there is an open question as to what the prevailing norms were at the time Farhane's plea was entered in 2006 requires ignoring

*Padilla's* holding, reasoning, and analysis. That is not an exercise this Court, or the district court on remand, is authorized to undertake.

A dissenting opinion makes too much of the sources for professional norms cited to in *Padilla* not using the specific word "denaturalization." *See* Walker Dissenting Op. at 13–15.

Denaturalization is naturally encompassed within immigration risks. More importantly, it is often synonymous with deportation. Farhane's case is one such example. The government is affirmatively seeking to denaturalize Farhane. *See generally* App'x at A306–A321. And the government has said it rarely pursues denaturalization when deportation is not the end goal. *See* Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull. 5, 17 (July 2017) ("[T]he government does not expend resources on civil denaturalization actions unless the ultimate goal is the removal of the defendant from the United States."). The relevant inquiry in *Padilla* is whether deportation is a risk. The sources cited to are concerned about the outcome of deportation. It is not surprising that the sources are not embroiled in the intricacies of how to get there.

A dissenting opinion also makes much of the fact that denaturalization is relatively uncommon, at least compared to post-conviction removal of non-citizens. *See* Walker Dissenting Op. at 12–13. Even if true, this argument misses the mark in two respects.

First, the frequency of denaturalization proceedings—which may well pertain to a narrower set of criminal defendants than deportation—does not carry the force that a dissent claims. A defendant's right to competent counsel does not depend on the uniqueness of his circumstances. To render effective assistance, a lawyer must "inform[] himself or herself fully on the facts and the law" as applicable to the defendant's particular case. *ABA Standards for Criminal Justice, Prosecution Function and Defense Function*, Standard 4-5.1(a) (3d ed. 1993). "The starting point and continuing focal point of the plea bargaining process is, of course, the client." 2 Crim. Prac. Manual § 45:3 (West 2024). For Sixth Amendment purposes, what matters is the effect of a guilty plea on a particular defendant's risk of deportation; unimportant is the precise means by which that risk might materialize.

Second, assistance can be ineffective when it makes the government's ability to deport the defendant much easier, even if the government ultimately does not

exercise its prosecutorial prerogative. After all, Padilla's deportation was only "automatic" in a legal sense, not in a practical one. As the Supreme Court recognized in a different case, "the Executive Branch does not possess the resources necessary to arrest or remove all of the noncitizens covered by" the statutes that mandated Padilla's removal. *United States v. Texas*, 599 U.S. 670, 680 (2023). "That reality is not an anomaly—it is a constant." *Id.* So, although Padilla's plea gave the government a nearly "automatic" right to deport him, his risk of actual deportation was far from certain. Nonetheless, because his guilty plea increased his deportation risk, his lawyer was required to apprise him of that fact.

Here, Farhane's guilty plea similarly made the government's burden to deport him much lighter, necessarily increasing his risk that the government would successfully seek his deportation. The historic frequency with which the government sought to denaturalize defendants after conviction does little to change that fact; as the dissent recognizes, "[o]ur Sixth Amendment analysis should not depend on the varying prosecutorial priorities of the Department of Justice." Walker Dissenting Op. at 8 n.7.

### B. Examining the Evidentiary Record Is Now Left to the District Court.

In my view, this means that with respect to the deficient performance prong of *Strickland*, the district court need only determine whether Farhane's trial counsel

11

warned him that there were potential immigration consequences.[3]  If Farhane was not so warned, that would be sufficient to establish deficient performance under *Strickland*'s first prong.

This Court today correctly left this determination to the district court.  It is not the job of this Court to conduct this analysis without giving the parties the opportunity to develop the record.

Yet, a dissenting opinion conducts its own *Strickland* analysis and argues that the record lacks sufficient evidence that Farhane's counsel knew of "*any* of the circumstances" or the "timing" of Farhane's denaturalization.  *See* Walker Dissenting Op. at 11.  But there are several pieces of information that could be

---

[3]      Inarguably, the obligation that *Padilla* imposed upon attorneys like Farhane's counsel is manageable.

Immigration law, as the *Padilla* Court acknowledged, is a complex field.  *See* 559 U.S. at 369.

The elegance of *Padilla* is that it avoids all the complication with a plain rule for attorneys to warn clients when she or he faces an increased risk of deportation from a guilty plea.  In determining that the professional obligation to warn attaches where there is a risk of deportation, *Padilla* does not encumber defense counsel with the obligations of knowing all the ins and outs of immigration law, such as what exact proceedings are required to effectuate that deportation.  *See id.* (sufficiently effective counsel "need do no more than advise a noncitizen client that pending criminal charges may carry a risk of adverse immigration consequences"); *see also id.* at 387-88 (Alito, J., concurring) (defense counsel should advise their client of potential adverse immigration consequences and encourage them to seek the assistance of immigration counsel for additional advice).

All Farhane's counsel was required to do here under *Padilla* was to advise him of the immigration risks he faced pursuant to his guilty plea.

12

relevant to the district court's *Strickland* analysis. For example, Farhane's counsel's statements at the November 2, 2005 detention hearing, a year before the guilty plea, make plain that he knew Farhane was a naturalized citizen. *See* App'x at A128:24–25 (Farhane's counsel stating that "[Farhane's] an immigrant . . . [h]e's a naturalized United States citizen."). At the time of the detention hearing, Farhane's counsel also knew the immigration status of Farhane's kids, *i.e.*, that two of his six children were born in the United States. *See id.* at A128:17–19. Additionally, Farhane's counsel was aware of the conduct to which Farhane was pleading guilty and the dates of those alleged crimes. *See id.* at A128:3–15 (Farhane's counsel discussing the allegations in the complaint); *id*. at A178:20–A179:3 (Farhane confirming to the district court judge at the beginning of his guilty plea proceedings that he and his counsel had reviewed the charges against him). These few key pieces of information shed much light on what Farhane's counsel knew. [4] It is up to the district court on remand to determine whether Farhane's counsel advised Farhane about his risk of deportation if he pleaded guilty.

---

[4] Farhane's counsel reiterated many of these facts in his Memorandum of Law in Aid of Sentencing. *See* App'x at A203 (Farhane's counsel stating in the Memorandum that "Mr. Farhane his [sic] a 52 year-old naturalized United States citizen who has lived in Brooklyn, New York for over 20 years."); *see also id.* at A203–05 (emphasizing the immigration status of Farhane's wife and kids, *i.e.*, that his wife was "*also* a naturalized United States citizen," and that his two youngest children were "native born United States citizen[s]" while three of his four oldest children were "naturalized United States citizen[s]" (emphasis added)).

13

\* \* \*

The Sixth Amendment right to effective assistance of counsel is an integral part of our justice system. This right cannot be fulfilled without advising clients when a guilty plea puts them at risk of deportation. *Padilla* established this, and in doing so concluded that Padilla's counsel's failure to so advise Padilla was inconsistent with the prevailing professional norms of the day. On remand, the district court needs to look no further than those *Padilla* norms.

WALKER, *Circuit Judge*, joined in full by SULLIVAN, PARK, and MENASHI, *Circuit Judges*, and joined as to Part I by NARDINI, *Circuit Judge*, dissenting:

The majority insists that this case should be decided by a rote application of the Supreme Court's decision in *Padilla v. Kentucky*, 559 U.S. 356 (2010). But this reductive approach ignores critical distinctions between *Padilla* and the present case—distinctions that make all the difference if we carefully follow the reasoning of *Padilla*.

*Padilla* "breach[ed] the previously chink-free wall between direct and collateral consequences" by holding that, because "[d]eportation . . . is 'unique,'" "criminal defense attorneys must inform non-citizen clients of the risks of deportation arising from guilty pleas." *Chaidez v. United States*, 568 U.S. 342, 345–46, 352–53 (2013) (quoting *Padilla*, 559 U.S. at 365). In concluding that this case is a direct application of *Padilla*, the majority overlooks important differences between a noncitizen facing "virtually mandatory" deportation as a direct consequence of his guilty plea, *Padilla*, 559 U.S. at 359, and a naturalized citizen facing possible civil denaturalization—and then, as an even more remote and uncertain consequence, potential deportation. The majority then remands this case to the district court to conduct another *Strickland* analysis, even though (1) the district court has already correctly determined that Farhane's counsel's representation was not objectively unreasonable[1] and (2) the record before us plainly establishes that Farhane was not prejudiced by his counsel's purported ineffectiveness.

Because this case fundamentally differs from *Padilla* on the threshold Sixth Amendment issue—and because, in any event, Farhane's representation was not constitutionally deficient, nor did it cause him prejudice—I respectfully dissent.

---

[1] *See Farhane v. United States*, No. 18-CV-11973, 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020).

## I.  The Threshold Sixth Amendment Question

The majority contends that the Sixth Amendment obligates defense counsel to warn naturalized citizen clients of both denaturalization and deportation risks. I address each conclusion in turn.

### A. Civil Denaturalization

The Supreme Court has recognized that, in determining the scope of the Sixth Amendment's guarantee of effective assistance of counsel, "state and lower federal courts [have] almost unanimously concluded that . . . attorneys [are not required] to inform their clients of a conviction's collateral consequences," meaning those consequences that are not "a component of the criminal sentence." *Chaidez*, 568 U.S. at 349–50; *see also Padilla*, 559 U.S. at 364 & n.8 (noting that, although "[t]here is some disagreement among . . . courts over how to distinguish between direct and collateral consequences," collateral consequences tend to be "those matters not within the sentencing authority of the [criminal] court").[2]

Nonetheless, the Court determined in *Padilla*, a case involving a noncitizen, that the direct/collateral distinction was "ill suited to evaluating" whether the "specific risk of deportation" was covered by the Sixth Amendment duty to warn. *Padilla*, 559 U.S. at 366.  It did so because of (1) deportation's "particularly severe" nature and (2) the "uniquely" "close connection [between] the criminal process" and "[d]eportation *as a consequence of* a criminal conviction."  *Id.* at 365–66

---

[2] *See also* Jenny Roberts, *Ignorance Is Effectively Bliss: Collateral Consequences, Silence, and Misinformation in the Guilty-Plea Process*, 95 Iowa L. Rev. 119, 124 (2009) (explaining that, under the direct/collateral framework, defense counsel must inform pleading clients of the "'direct,' or penal, sanctions—such as jail or prison time, probationary period or a fine—[that may] result from [a] conviction," but need not inform clients of the collateral consequences of a conviction, such as "sex-offender registration, . . . involuntary civil commitment . . . , the loss of voting rights, . . . the loss of housing and employment opportunities," and, before *Padilla*, deportation); *Padilla*, 559 U.S. at 376 (Alito, J., concurring in the judgment) (noting that collateral consequences include "civil commitment, civil forfeiture, the loss of the right to vote, disqualification from public benefits, ineligibility to possess firearms, dishonorable discharge from the Armed Forces, and loss of business or professional licenses").

(emphasis added). While civil denaturalization is undoubtedly a severe penalty, it is not "intimately related to the criminal process," *id.* at 365, since, unlike most avenues to deportation, civil denaturalization is almost never dependent on a criminal conviction. Understanding this critical difference between deportation and denaturalization requires taking a closer look at the statutory scheme of each consequence.

Although noncitizens can be deported for reasons other than having been criminally convicted,[3] "[f]ederal immigration enforcement turns increasingly on . . . criminal convictions triggering deportability."[4] Being "convicted of," rather than simply committing, a broad swath of criminal offenses is what renders noncitizens "deportable."[5] Thus, a criminal conviction is strictly necessary, not just sufficient, for many forms of deportation.

---

[3] *See, e.g.*, 8 U.S.C. §§ 1227(a)(1), (a)(3), (a)(5), (a)(6).

[4] Note, *States' Commandeered Convictions: Why States Should Get a Veto Over Crime-Based Deportation,* 132 HARV. L. REV. 2322, 2322 (2019); *see id.* at 2331 ("[C]onviction-based deportations skyrocketed from fewer than 1000 through 1984 to almost 70,000 by 1999 and more than twice that today." (internal citations omitted)).

[5] *See, e.g.*, 8 U.S.C. § 1227(a)(2)(A)(i)(I), (a)(2)(A)(ii) (crimes "involving moral turpitude"); *id.* at (a)(2)(A)(i)(II) (crimes for which a sentence of at least a year may be imposed); *id.* at (a)(2)(A)(iii) (aggravated felonies); *id.* at (a)(2)(A)(iv) (high speed flight from an immigration checkpoint); *id.* at (a)(2)(A)(v) (failure to register as a sex offender); *id.* at (a)(2)(B)(i) (most controlled substance offenses); *id.* at (a)(2)(C) (certain firearm offenses); *id.* at (a)(2)(D)(i) (offenses related to espionage, sabotage, and treason and sedition); *id.* at (a)(2)(D)(ii) (offenses related to threatening the President, Vice President, and other political officials via mail); *id.* at (a)(2)(D)(iii) (violations of the Military Selective Service Act or the Trading With the Enemy Act); *id.* at (a)(2)(D)(iv) (violations of certain travel-control restrictions or importation of a noncitizen for an immoral purpose); *id.* at (a)(2)(E)(i) (domestic violence, stalking, child abuse, child neglect, or child abandonment); *id.* at (a)(3)(B)(i) (knowingly filing registration application with false statements or attempting to procure registration through fraud); *id.* at (a)(3)(B)(ii) (violations of the Foreign Agents Registration Act of 1938); *id.* at (a)(3)(B)(iii) (violations relating to fraud and misuse of visas, permits, and other entry documents).

By contrast, civil denaturalization is virtually never dependent on a criminal conviction. A citizen may be denaturalized civilly if his naturalization was either (1) procured "by concealment of a material fact or by willful misrepresentation" or (2) "illegally procured." 8 U.S.C. § 1451(a). "Citizenship is illegally procured any time the applicant has failed to comply with any of the congressionally imposed prerequisites to the acquisition of citizenship," *United States v. Sprogis*, 763 F.2d 115, 117 n.2 (2d Cir. 1985) (internal quotation marks and citation omitted), including being "a person of good moral character" for the five years immediately preceding the date of filing a citizenship application through the date the applicant is admitted to citizenship, 8 U.S.C. § 1427(a). A person cannot qualify as having good moral character if, within the statutory period, he fell within eight categories enumerated in 8 U.S.C. § 1101(f).[6] Section 1101(f) also contains a catch-all

---

[6] Under 8 U.S.C. § 1101(f), a person cannot have the requisite good moral character if, during the period for which good moral character was required, he was:

(1) a habitual drunkard;

(2) Repealed. Pub. L. 97-116, § 2(c)(1), Dec. 29, 1981, 95 Stat. 1611.

(3) a member of one or more of the classes of persons, whether inadmissible or not, described in paragraphs (2)(D), (6)(E), and (10)(A) of section 1182(a) of this title; or subparagraphs (A) and (B) of section 1182(a)(2) of this title and subparagraph (C) thereof of such section (except as such paragraph relates to a single offense of simple possession of 30 grams or less of marihuana), if the offense described therein, for which such person was convicted or of which he admits the commission, was committed during such period;

(4) one whose income is derived principally from illegal gambling activities;

(5) one who has been convicted of two or more gambling offenses committed during such period;

(6) one who has given false testimony for the purpose of obtaining any benefits under this chapter;

(7) one who during such period has been confined, as a result of conviction, to a penal institution for an aggregate period of one hundred and eighty days or more, regardless of

4

provision, which states that "[t]he fact that any person is not within any of the foregoing classes shall not preclude a finding that for other reasons such person is or was not of good moral character."

Pursuant to § 1101(f), the Department of Homeland Security promulgated regulation 8 C.F.R. § 316.10, which includes additional circumstances under which an applicant "shall be found to lack good moral character." 8 C.F.R. § 316.10(b)(1)–(3). The regulation contains its own catch-all provision, which instructs that, "[u]nless the applicant establishes extenuating circumstances," he shall be found to lack good moral character if he "[c]ommitted unlawful acts that adversely reflect upon [his] moral character, or was convicted or imprisoned for such acts." *Id.* at § 316.10(b)(3)(iii). Therefore, in the vast majority of circumstances, a criminal conviction is not necessary for civil denaturalization, which can instead result from the offender's underlying behavior. Moreover, criminal conduct may have no impact on a naturalized citizen's citizenship if it occurs after naturalization.

Jose Padilla and Abderrahmane Farhane themselves exemplify this distinction between deportation and civil denaturalization. Padilla could not have been deported under 8 U.S.C. § 1227(a)(2)(B)(i) for the *conduct* of distributing drugs, but he automatically became "deportable" under that provision the instant he was "*convicted of*" distributing drugs. 8 U.S.C. § 1227(a)(2)(B)(i) (emphasis added). By contrast, Farhane's conviction did not render him denaturalizable.

whether the offense, or offenses, for which he has been confined were committed within or without such period;

(8) one who at any time has been convicted of an aggravated felony (as defined in subsection (a)(43)); or

(9) one who at any time has engaged in conduct described in section 1182(a)(3)(E) of this title (relating to assistance in Nazi persecution, participation in genocide, or commission of acts of torture or extrajudicial killings) or 1182(a)(2)(G) of this title (relating to severe violations of religious freedom).

8 U.S.C. § 1101(f) (internal footnote omitted).

5

Farhane was subject to denaturalization at least five years *before* he ever pled guilty: he supplied the grounds for his denaturalization in 2001, when he conspired to commit money laundering, and again in 2002, when he lied to a U.S. Citizenship and Immigration Services ("USCIS") officer by denying, multiple times, that he had ever "knowingly committed any crime for which he had not been arrested." Gov't Br. at 5. Thus, the government sought Farhane's denaturalization not on the basis of his conviction but for: (1) "commit[ing]" the crime of conspiracy, an act "that adversely reflected on his moral character," App'x 315–16 (citing 8 C.F.R. § 316.10(b)(3)(iii)); (2) giving false testimony under oath for the purpose of obtaining naturalization, *id.* at 316–17 (citing 8 U.S.C. § 1101(f)(6) and 8 C.F.R. § 316.10(b)(2)(vi)); and (3) procuring his naturalization by concealment of material facts and by willful misrepresentation, *id.* at 318–19 (citing 8 U.S.C. § 1451(a)). In short, even if Farhane had gone to trial and been *acquitted*, the government could still have sought to denaturalize him.

Farhane's conviction serves only to collaterally estop him from denying his participation in the conspiracy, thereby saving the government from having to prove its case for denaturalization through agent testimony and damaging recordings that captured Farhane "plotting to send money to self-proclaimed '*mujahideen*' then waging war against the United States overseas." Gov't Br. at 2. The majority stresses this point, asserting that the fact that Farhane's guilty plea makes it "easier" for the government to denaturalize him renders the risk of denaturalization a "sufficiently automatic consequence" of the plea. Maj. Op. at 23. But the fact that the government now has a somewhat easier path to prove an already strong case for denaturalization does not make this case like *Padilla*, where the conviction instantly rendered Padilla deportable. *See Padilla*, 559 U.S. at 359 (noting that Padilla's guilty plea "made his deportation virtually mandatory"). Farhane can still assert defenses to each of the three bases for denaturalization, none of which is foreclosed by estoppel. He could, for example, contend that: (1) "extenuating circumstances" excuse any bad acts that would otherwise demonstrate his lack of good moral character, 8 C.F.R. § 316.10(b)(3); (2) his false

6

testimony was not "made . . . with an intent to obtain an immigration benefit" but instead was made unintentionally or out of embarrassment, fear, or a desire for privacy, 8 C.F.R. § 316.10(b)(2)(vi); or (3) his misrepresentations were not "willful," 8 U.S.C. § 1451(a). *See Kungys v. United States*, 485 U.S. 759, 780–81 (1988) (indicating that a lie told in the naturalization process out of "embarrassment, fear, or a desire for privacy" is not a sufficient basis for denaturalization under 8 U.S.C. § 1101(f)(6)); *Maslenjak v. United States*, 582 U.S. 335, 345–46 (2017) (same but under 8 U.S.C. § 1451(a)). In other words, not only is Farhane's guilty plea not necessary for the government to denaturalize him; it is not even sufficient.

The fact that a criminal conviction is frequently necessary for deportation while, in almost every case, civil denaturalization can occur without a conviction explains why *Padilla*'s logic does not extend to civil denaturalization. *Padilla* painstakingly emphasized the degree of "enmesh[ment] [between] criminal convictions and the penalty of deportation," *Padilla*, 559 U.S. at 365–66, concluding that deportation was "uniquely difficult to classify as either a direct or a collateral consequence" because of the "close connection" between "[d]eportation *as a consequence of a criminal conviction* [and] the criminal process," *id.* at 366 (emphasis added). While criminal convictions now make deportation "virtually inevitable for a vast number of noncitizens," *id.* at 360, who, without a conviction, often would not be eligible for deportation, civil denaturalization does not share the same reliance on—and therefore the same enmeshment with—criminal convictions. This is why the Supreme Court emphasized that "[d]eportation . . . is 'unique,'" *Chaidez*, 568 U.S. at 352, and that "*Padilla* . . . did not eschew the direct-collateral divide across the board," *id*. at 355. Thus, *Padilla*'s narrow deportation exception to the otherwise "chink-free wall between direct and collateral consequences," *Chaidez*, 568 U.S. at 352–53—a framework which this court has indicated continues to operate post-*Padilla*, *see United States v. Youngs*, 687 F.3d 56, 62 (2d Cir. 2012) (Fifth Amendment context); *Santiago v. Laclair*, 588 F. App'x 1, 4 (2d Cir. 2014) (summary order) (Sixth Amendment context)—should not be expanded to civil denaturalization.

7

**b. Deportation Following Civil Denaturalization**

Not confident in the notion that denaturalization standing alone should be removed from the direct/collateral framework, the majority also asserts that "[a] risk of denaturalization simply *is* a risk of deportation."  Maj. Op. at 16.[7]  But nothing in *Padilla* requires that a naturalized citizen like Farhane be advised of the potential risk of deportation that might follow if, and only if, he is first civilly denaturalized.  Despite the broad language of *Padilla*'s holding that "counsel must inform her client whether his plea carries a risk of deportation," 559 U.S. at 374, the rest of the opinion's language and its core reasoning do not support requiring such advice when counsel advises a naturalized citizen client.  Consistent language throughout the opinion makes clear that the Court was focused only on what advice the Sixth Amendment requires defense attorneys to offer *noncitizen* clients.  For example, the opinion described how changes in federal immigration law have made removal "practically inevitable" for "*noncitizen[s]*," *id.* at 363–64 (emphasis added), discussed how being informed of deportation risk can benefit "*noncitizen* defendants," *id.* at 373 (emphasis added), and stressed "how critical it is for counsel to inform her *noncitizen* client [of deportation risks]," *id.* at 373–74 (emphasis added).

More importantly, *Padilla*'s reasoning confirms that its Sixth Amendment holding should not apply to counsel advising a naturalized citizen client at risk of deportation only if he is first civilly denaturalized.  It is because of changes in immigration law that "have made removal *nearly an automatic result* for a broad class of *noncitizen* offenders" that the Court found it "most difficult to divorce the penalty from the conviction in the deportation context."  *Id.* at 366 (emphases

---

[7] To support this proposition, the majority relies on a statement in an article in a 2017 U.S. Attorneys' Bulletin that the government "[t]ypically . . . does not expend resources on civil denaturalization actions unless the ultimate goal is . . . removal . . . ."  Maj. Op. at 16 n.6 (quoting Anthony D. Bianco et al., *Civil Denaturalization: Safeguarding the Integrity of U.S. Citizenship*, 65 U.S. Attys' Bull., July (I) 2017, at 5, 17).  That may indeed have been the case historically, but of course would be subject to change depending on the presidential administration.  Our Sixth Amendment analysis should not depend on the varying prosecutorial priorities of the Department of Justice.

added) (internal quotation marks omitted); *see id.* at 359 (noting that Padilla's guilty plea made his "deportation virtually mandatory"). But no equivalent automaticity exists in those exceedingly rare cases where a *citizen* faces a risk of deportation that is first contingent upon a separate civil denaturalization proceeding. If it is true that the Sixth Amendment does not require defense attorneys to advise clients on civil denaturalization risk because civil denaturalization is not as closely tied to a criminal conviction as is deportation, then it would be nonsensical to conclude that the Sixth Amendment requires counsel to advise of a deportation risk that is entirely dependent on a client first becoming civilly denaturalized. Deportation under such circumstances simply cannot be deemed "nearly an automatic result." *Id.* at 366. To conclude otherwise would be to strip *Padilla*'s holding from its careful, contextual reasoning.

In sum, *Padilla*'s core reasoning does not apply in Farhane's case, in which the preexisting denaturalization risk was independent of and at most collateral to his conviction and any deportation risk was entirely dependent on Farhane first becoming denaturalized. I therefore see no reason to forgo the direct/collateral distinction in this case, much less impose an additional Sixth Amendment burden on defense counsel.

## II.    *Strickland*'s Ineffective-Assistance Test

Even if the Sixth Amendment requires defense counsel to warn naturalized citizen clients of potential denaturalization and deportation risks, Farhane's ineffective assistance of counsel claim nonetheless fails because he has not shown (1) that "counsel's representation fell below an objective standard of reasonableness," or (2) that he suffered prejudice, meaning "there is a reasonable probability that, but for counsel's [alleged] unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984).

9

## A. The Deficient-Performance Prong

I agree with the district court (Preska, *J.*) that "it was not objectively unreasonable for [Farhane's] lawyer to give no advice on [the immigration consequences]" of Farhane's guilty plea and see no reason to remand this issue, which is fully briefed before us. *Farhane v. United States*, No. 18-CV-11973, 2020 WL 1527768, at *2 (S.D.N.Y. Mar. 31, 2020); see also *Sepulveda v. Block*, 782 F.2d 363, 364 (2d Cir. 1986) (concluding that there was "no need for a remand" when an issue did not "require further fact-finding or ventilation"); *United States v. Kurti*, 427 F.3d 159, 163 (2d Cir. 2005) (rejecting ineffective-assistance claim where record, "[v]iewed in its entirety," showed that attorney's performance "fell within prevailing professional norms" (internal quotation marks omitted)).

*Strickland*'s deficient-performance inquiry measures "whether an attorney's representation "amounted to incompetence under 'prevailing professional norms.'" *Harrington v. Richter*, 562 U.S. 86, 105 (2011) (quoting *Strickland*, 466 U.S. at 690). This inquiry must be: (1) fact-specific, with any conclusion drawn "in light of *all* the circumstances," *Strickland*, 466 U.S. at 687, 690 (emphasis added); (2) "highly deferential" to counsel's conduct, *id.* at 689; and (3) made without "the distorting effects of hindsight," *id.* It is not enough that the attorney's conduct might have "deviated from best practices or most common custom." *Harrington*, 562 U.S. at 105; *see also Strickland*, 466 U.S. at 689 (noting that the purpose of the right to effective counsel is not to improve the quality of legal representation). Rather, *Strickland*'s first step is met only if Farhane's attorney's failure in 2006 to provide his client advice regarding denaturalization (or the possibility of deportation following denaturalization) prior to his guilty plea was "so serious" a mistake as to fall outside "the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 687, 690. That standard is not met here.

In remanding the question of deficient performance to the district court, the majority conflates that question with the threshold Sixth Amendment issue discussed in Section I of this dissent. The majority concludes that the district court

10

"impermissibly narrowed *Padilla*" by considering the fact that Farhane's conviction did not create "an imminent risk of deportation," when, in the majority's view, the Sixth Amendment requires counsel to inform naturalized citizen clients of even remote risks of deportation. Maj. Op. at 34 (quoting *Farhane*, 2020 WL 1527768, at *2). But the district court appropriately made that point as part of its deficient performance analysis, explaining that—due to the fact that Farhane's denaturalization risk stemmed from his conduct prior to pleading guilty, rather than from the guilty plea itself—"Farhane's lawyer had no basis for suspecting that the guilty plea could have immigration consequences." *Farhane*, 2020 WL 1527768, at *2. In essence, Farhane failed to provide his counsel with the facts necessary to recognize the *indirect* denaturalization risk (and potential subsequent deportation risk) posed by his conviction. In *Padilla*, by contrast, Padilla's deportation risk was "*nearly an automatic result*," 559 U.S. at 366 (emphasis added), of his plea, such that his counsel needed no additional factual background to appreciate that risk.

"The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions." *Strickland*, 466 U.S. at 691. Thus, "[a] trial counsel cannot be ineffective for failing to raise claims as to which his client has neglected to supply the essential underlying facts when those facts are within the client's possession . . . ." *Dooley v. Petsock*, 816 F.2d 885, 890–91 (3d Cir. 1987). The majority does not dispute the district court's factual conclusion that "nothing in the record suggests [Farhane's] lawyer knew, or should have known, about the circumstances giving rise to . . . Farhane's denaturalization exposure." *Farhane*, 2020 WL 1527768, at *2. Nor could it—there is simply no evidence that, prior to pleading guilty, Farhane (or any other source) informed his defense attorney of *any* of the circumstances surrounding his naturalization, not even its timing. Without that information, Farhane's attorney could not have begun to appreciate a potential risk of denaturalization or deportation, however remote those possibilities might have been. Therefore, it was not objectively unreasonable for his lawyer to give no advice on those issues.

11

*See, e.g., Hill v. Lockhart*, 474 U.S. 52, 61–62 (1985) (White, J., concurring in the judgment) (concluding that there could be no ineffective assistance where there was no allegation that defendant told attorney about previous conviction); *Jackson v. Scully*, 781 F.2d 291, 297 (2d Cir. 1986) (concluding that counsel was not ineffective for failing to raise an alleged Fourth Amendment violation where petitioner did not inform counsel of the circumstances surrounding the allegedly improper arrest).

The alternative deficient-performance analysis that the majority implicitly suggests—which would rely on the Supreme Court's conclusion that Padilla's counsel was constitutionally ineffective in 2002 for affirmatively misadvising his noncitizen client of deportation risk to conclude that Farhane's counsel was similarly deficient in 2006 for failing to advise his naturalized citizen client of denaturalization and deportation risk—is misguided. *See* Maj. Op. at 34 n.18. For the reasons outlined below, this case fundamentally differs from *Padilla* on the issue of deficient performance, making dependence on that case inapposite.

First, the drastic difference in prevalence between denaturalization and deportation bears on what knowledge should be expected of a reasonable defense attorney practicing at the time of Farhane's plea in 2006. Fewer than 150 denaturalization proceedings took place nationwide between 1968 and 2012 (a 44-year period), resulting in an average of fewer than four such proceedings per year.[8] By contrast, between 1997 and 2007 (only a 10-year period), 897,099 noncitizens were deported, for an average of approximately 27,184 deportations a year—and that figure includes only "individuals deported on criminal grounds."[9] The

---

[8] Amber Qureshi, *The Denaturalization Consequences of Guilty Pleas*, 130 YALE L.J. F. 166, 170 (2020).

[9] *Forced Apart (By the Numbers)*, Human Rights Watch (April 15, 2009), https://www.hrw.org/report/2009/04/15/forced-apart-numbers/non-citizens-deported-mostly-nonviolent-offenses [https://perma.cc/VQ3X-ZMSC] (capitalization altered); *see id.* (noting that

extreme historical rarity of denaturalization makes it exceedingly unlikely that an average defense attorney in 2006, when Farhane pled guilty, would have thought to explore denaturalization as a contingent effect of a naturalized citizen's guilty plea—let alone considered the even more tenuous consequence of deportation that was first dependent on denaturalization. By contrast, given the large number of criminally based deportations occurring annually, it would not have been uncommon in 2002, when Padilla pled guilty, for defense attorneys to know that a noncitizen client might be imminently at risk of deportation due to a criminal conviction. In sum, it was less unreasonable for Farhane's counsel to fail to warn of an extremely uncommon risk than for Padilla's counsel to fail to warn of a much more prevalent risk.

Second, although the materials cited by Farhane and the *amici* as establishing prevailing professional norms in 2006 (the "Norms Materials") discuss at length the importance of warning pleading defendants of deportation consequences, not one states that defense attorneys should also advise clients of denaturalization consequences.[10] Instead, Farhane relies on the fact that some of these materials instructed defense counsel to advise clients about the "immigration consequences" that could follow a guilty plea. Appellant's Br. at 34. In hindsight, one might be tempted to assume—as Judge Pérez does in concurrence—that denaturalization was one of the "immigration consequences"

---

20% of the 897,099 deported noncitizens had, like Jose Padilla, been living legally in the U.S. prior to their deportation).

[10] *See, e.g.*, National Legal Aid and Defender Association, *Performance Guidelines for Criminal Defense Representation* §§ 6.2(a)(3), 8.2(b)(8) (1995) (specifically citing deportation, but not denaturalization, as an example of a collateral consequence that defense counsel should discuss with pleading clients); American Bar Association, *ABA Standards for Criminal Justice: Pleas of Guilty*, at xi, 116, 125–26 & n.25 (3d ed. 1999) ("ABA 1999") (same); Gabriel J. Chin & Richard W. Holmes, Jr., *Effective Assistance of Counsel and the Consequences of Guilty Pleas*, 87 CORNELL L. REV. 697, 713–18 (2002) (same); New York State Bar Association, *Standards for Providing Mandated Representation* Standard I-7(a), at 16 (Apr. 2, 2005) ("NYSBA") (same); *see also* ABA 1999, at 36, 58 & nn.95–96, 59 & n.98 (similar but regarding courts' advice to defendants).

referenced by these materials.  But this assumption has no basis.  We must put such assumptions aside and interpret what standards of reasonableness the Norms Materials actually evinced in 2006.  *See Strickland*, 466 U.S. at 689 ("[E]very effort [must] be made to eliminate the distorting effects of hindsight . . . .").  And the fact that every such source that enumerates specific "immigration consequences" *does not list denaturalization*[11] provides powerful evidence that, in 2006, prevailing professional norms did not require defense counsel to warn pleading clients of the possibility of denaturalization.  That conclusion is reinforced by how uncommon denaturalization was at the time.

Third, virtually all of the Norms Materials that require defense counsel to advise of "immigration consequences" only require such advice for *noncitizen* clients like Padilla.[12]  This reinforces the point that denaturalization, which can

---

[11] *See, e.g.*, Katherine A. Brady et al., *Representing the Noncitizen Criminal Defendant*, *in* CALIFORNIA CRIMINAL LAW PROCEDURE AND PRACTICE 1297 § 48.2, at 1301–02 (Robert Waxman, ed., 5th ed. 2000) ("Brady et al.") (denaturalization not included in list of immigration consequences); New York State Defenders Association Immigrant Defense Project, *Deportation 101*, at 23 (Feb. 2005) ("*Deportation 101*") (same).  *Deportation 101* does mention denaturalization in passing, but only to explain the obvious fact that citizens who are denaturalized "*may* . . . be vulnerable to deportation."  *Id.* at 21 (emphasis added).  More to the point, it does not list denaturalization as a "potential effect[]" or "immigration consequence[]" of a criminal conviction. *Id.* at 21, 23 (capitalization altered).  Although we must judge ineffective assistance of counsel in this case based on the professional norms that existed in 2006, when Farhane pled guilty, post-2006 materials continued the trend of excluding denaturalization from lists of "immigration consequences."  *See, e.g.*, NORTON TOOBY, TOOBY'S GUIDE TO CRIMINAL IMMIGRATION LAW § 3.3(A), at 48 (2008) (denaturalization not included in list of immigration consequences); AMERICAN BAR ASSOCIATION, STANDARDS FOR CRIMINAL JUSTICE § 4-5.5(c) (4th ed. 2017) ("ABA 2017") (same).

[12] *See, e.g.*, ABA 1999, *supra*, at 126 (implying that defense counsel must only advise "non-citizens" of "immigration consequences"); Brady et al., *supra*, at 1298–1303 (stating that effective counsel must advise clients on immigration consequences in chapter titled "Representing the Noncitizen Criminal Defendant" (capitalization altered)); MATTHEW BENDER & CO., PUB. NO. 202, RELEASE 95, 3 CRIMINAL DEFENSE TECHNIQUES § 60A.01 (2008) (treatise page last updated in September 2002 stating that "[w]hen representing an alien in criminal court, an attorney must consider the effect a criminal conviction may have on the client's immigration status"); NORTON TOOBY WITH KATHERINE A. BRADY, 1 CRIMINAL DEFENSE OF IMMIGRANTS § 1.3,

14

only happen to a naturalized *citizen*, is not an "immigration consequence" within the meaning of these materials. But it also undercuts the majority opinion's conclusion that Farhane's counsel was unreasonable for failing to advise him of potential *deportation* consequences: if prevailing norms in 2006 only required defense counsel to discuss deportation consequences with noncitizens, then Farhane's counsel was not ineffective for failing to discuss such consequences with his naturalized-citizen client. *Padilla*, decided four years later, similarly emphasized that "[a] reasonably competent lawyer will tell a *non-citizen* client about a guilty plea's deportation consequences." *Chaidez*, 568 U.S. at 356–57 (emphasis added); *see also Padilla*, 559 U.S. at 369 ("When the law is not succinct and straightforward . . . , a criminal defense attorney need do no more than advise a *noncitizen* client that pending criminal charges may carry a risk of adverse immigration consequences." (emphasis added)).

Fourth, while Farhane's lawyer was not prompted to and thus did not discuss denaturalization with Farhane, Padilla alleged that his lawyer affirmatively misadvised him about deportation risk. *See Padilla*, 559 U.S. at 359 ("Padilla claims that his counsel not only failed to advise him of [the deportation] consequence prior to his entering the plea, but also told him that he 'did not have

---

at 12–18 (3d ed. 2003) (stating that effective counsel must advise clients on immigration consequences in chapter titled "Criminal Defense of Noncitizens"); *Deportation 101*, *supra*, at 23 (list of "immigration consequences of convictions" only lists consequences "apply[ing] to . . . noncitizens" (capitalization altered)). Although we must judge ineffective assistance of counsel in this case based on the professional norms that existed in 2006, post-2006 norms materials indicate that requiring defense counsel to warn only noncitizen clients of potential immigration consequences continues to be a widespread practice. *See, e.g.*, Peter L. Markowitz, *Protocol for the Development of a Public Defender Immigration Service Plan*, app. G at 13 (2009) (reproducing a training presentation encouraging defense attorneys to "Determine if Your Client is a Noncitizen and thus at Risk of Suffering Negative Immigration Consequences"); KARA HARTZLER, SURVIVING PADILLA: A DEFENDER'S GUIDE TO ADVISING NONCITIZENS ON THE IMMIGRATION CONSEQUENCES OF CRIMINAL CONVICTIONS (2011) (implying that only noncitizens need be advised of immigration consequences); ABA 2017, *supra*, at § 4-5.5(b) (same); Brittany Brown & Megan Hu, *Immigration*, 29 ATTICUS 21, 24–26 (2017) (same); Dawn Seibert & Isaac Wheeler, *Representing Immigrant Clients: Ethics and Practice* 2 (Apr. 3, 2014) (instructing defense counsel to ask clients where they were born in order to protect "noncitizen defendants").

to worry about immigration status since he had been in the country so long.' . . . Padilla relied on his counsel's erroneous advice when he pleaded guilty to the drug charges that made his deportation virtually mandatory." (internal citation omitted)). Although *Padilla* did not rely on any distinction between affirmative misadvice and keeping silent for purposes of conducting the threshold Sixth Amendment analysis of whether *Strickland* applies at all to deportation, *see id.* at 369–71, it endorsed the use of affirmative misadvice as a factor in the subsequent *Strickland* deficiency analysis, *see id.* at 368–69 ("Padilla's counsel provided him false assurance that his conviction would not result in his removal from this country. This is not a hard case in which to find deficiency: . . . his counsel's advice was incorrect."). The distinction between misadvice (in *Padilla*) and non-advice (here) is particularly important given that before *Padilla* we had consistently held "that an attorney's failure to inform a defendant of the immigration consequences of a guilty plea [did] not constitute ineffective assistance of counsel . . . , but that an attorney's affirmative misrepresentation about the [immigration] consequences of a guilty plea [could] constitute ineffective assistance." *Creary v. Mukasey*, 271 F. App'x 127, 128 (2d Cir. 2008) (summary order) (first citing *United States v. Santelises*, 509 F.2d 703, 704 (2d Cir. 1975) (per curiam); and then citing *United States v. Couto*, 311 F.3d 179, 188 (2d Cir. 2002)). It would be strikingly unfair to fault Farhane's lawyer for not advising his client in 2006 about potential denaturalization consequences when, until 2010, we informed defense counsel that they were *not* ineffective for not providing such advice even about potential deportation. *See* Maj. Op. at 4-5 (acknowledging that, prior to *Padilla*, we "treated adverse immigration consequences . . . as . . . perhaps beyond a criminal defense counsel's presumptive area of expertise").

In sum, any suggestion that *Padilla* should control our deficient-performance analysis here misses the mark, regardless of whether Farhane's counsel's conduct is framed as a failure to warn of denaturalization risk, a failure to warn of deportation risk, or both. *Padilla* crucially differs from this case in at least five ways: (1) Padilla's counsel had all the information necessary to know

16

of his client's deportation risk; (2) Padilla's counsel did not need to understand rare denaturalization risks to be cognizant of his client's more common deportation risk; (3) the Norms Materials discuss explicitly and at length the importance of warning pleading noncitizen defendants of deportation consequences[13]; (4) Padilla was a noncitizen client; and (5) Padilla's counsel gave affirmative misadvice. These differences in circumstance must be accounted for and, when they are, it becomes evident that Farhane has failed to overcome the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689; *see id.* at 688 ("[T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.").

## B. The Prejudice Prong

Farhane also fails to demonstrate prejudice, i.e., that his "counsel's errors were so serious as to deprive [him] of a fair trial." *Id.* at 687. In order to show prejudice in the plea-bargaining context, Farhane must prove either that, had he known of the denaturalization risk, (1) there would have been "a reasonable probability that [he] could have negotiated a plea that did not impact [his naturalized] status," *Doe v. United States*, 915 F.3d 905, 911 (2d Cir. 2019), or (2) he would have "insisted on going to trial," *Hill*, 474 U.S. at 59. I see no reason to remand this issue to the district court because the existing record plainly establishes that Farhane cannot carry his burden as to either possibility. *See Rainbow Line, Inc. v. M/V Tequila*, 480 F.2d 1024, 1026 (2d Cir. 1973) (noting that, even though the district court did not make "findings of fact on a number of the issues involved" in the case, remand was "unnecessary" because the record was

---

[13] *See supra* note 10. Pre-2006 Supreme Court case law also indicated that reasonable counsel should warn pleading noncitizen clients of deportation consequences but did not address whether denaturalization risk warnings were similarly required for naturalized citizen clients. *See Chaidez v. United States*, 568 U.S. 342, 356–57 (2013) ("[*INS v. St. Cyr*, 533 U.S. 289 (2001)] stated [that] . . . [a] reasonably competent lawyer will tell a non-citizen client about a guilty plea's deportation consequences . . . .").

"sufficiently clear on the key points"); *see also Rodriguez v. United States*, 730 F. App'x 39, 44 (2d Cir. 2018) (summary order) (remanding the issue of prejudice to the district court because it could not be determined "[o]n the present record" "whether [the appellant] would have opted to [go to trial] had she known she could be denaturalized").

First, the record demonstrates that Farhane could not have negotiated a plea deal that foreclosed a denaturalization risk. As the government points out, Farhane had minimal leverage with which to negotiate because of the strength of the government's case against him and the gravity of the charges. Farhane, who accepted a plea deal that resulted in a substantial prison sentence (albeit, reduced from a maximum of 23 to 13 years) rather than go to trial, now tries to make this seem like a close case, asserting he had "several pathways to defend against the government's charges." Appellant's Br. at 46. In reality, as Judge Preska stated at Farhane's bail hearing, the "the government ha[d] very strong evidence," including inculpatory recordings of Farhane agreeing to provide material support to terrorists. App'x 108. And at the time of his plea, Farhane's counsel—who was aware of all the issues surrounding the government's informant cited by the majority—admitted that Farhane had no viable defense and has not been faulted by Farhane for that admission.

Second, the record does not support—and indeed undermines—Farhane's claim that he would have insisted on going to trial, risking an additional decade in prison *and* still facing potential denaturalization. "The decision whether to plead guilty . . . involves assessing the respective consequences of a conviction after trial and by plea." *Lee v. United States*, 582 U.S. 357, 367 (2017). Here, Farhane's "consequences of taking a chance at trial were . . . markedly harsher than pleading," *id.* at 371, and he had very little to gain: it was almost certain that Farhane, having engaged in terrorism-related conduct, would be denaturalized anyway, whether he took the plea or went to trial (even upon an acquittal), *see id.* (concluding that it was not inherently irrational for Lee to risk "a year or two more

18

of prison time" by going to trial when his plea agreement would otherwise *guarantee* deportation). Farhane has failed to present "substantial and uncontroverted" "contemporaneous evidence" that remaining in the United States was of such "paramount importance" to him that he would have forgone a ten-year sentence reduction for only a *slightly* increased chance of staying in the country. *Id.* at 369–71; *see also Doe*, 915 F.3d at 911 ("[A] petitioner alleging ineffective assistance based on immigration misadvice must clearly demonstrate that he placed particular emphasis on [immigration consequences] in deciding whether or not to plead guilty." (second alteration in original) (internal quotation marks omitted)).

Farhane insists that statements he made in connection with his sentencing below about his desire to avoid familial separation indicate that he would have gone to trial had he been aware of the denaturalization risk. These statements instead demonstrate that Farhane was not concerned with potential immigration consequences, but rather was focused on minimizing his potential prison time, which the plea deal did by reducing his possible sentence by ten years. If Farhane were denaturalized and deported back to Morocco (where he was educated, previously worked, and continued to visit after his naturalization), he could take his family with him and find work to support them—but he could not have fulfilled his predominant aims of helping to raise his children and serving as the family breadwinner during the additional decade he may well have spent in prison had he gone to trial. Farhane's general statements about wanting to avoid familial separation not only fail to show that "avoiding [immigration consequences] was *the* determinative factor for him," *Lee*, 582 U.S. at 367: they affirmatively indicate that, at the time he pled guilty, Farhane was substantially prioritizing reducing the risk of a lengthier prison sentence over negligibly minimizing his denaturalization risk. This makes sense because Farhane could be denaturalized even if he had been acquitted, so he had nothing to gain and ten years to lose by proceeding to trial.

19

Finally, there is affirmative evidence that, around the time of his plea, Farhane did *not* care about his future ability to remain in the U.S. In 2004, he was recorded saying: "We should not think of this as our country. This is a country where we temporarily live," and "[t]his is not a country where we should stay. One should work hard here and then take off. The longer one stays here, the more people make you sick." App'x 91–92. Although Farhane dismisses these statements as "acontextual asides," Reply Br. at 27, he offers no context (nor is there any in the record) that might suggest that he was expressing anything other than, at best, a lack of commitment to his continued residence in the United States.

In sum, I see no reason to remand this issue because the ample evidence in the existing record is sufficient for us to confidently conclude that Farhane was not prejudiced by his counsel's performance.

## CONCLUSION

*Padilla*'s break from the longstanding and widespread direct/collateral distinction was premised on the uniquely intimate relationship between criminal convictions and the deportation of noncitizens. That same close relationship simply does not exist in the case of civil denaturalization—and thus also cannot exist in instances where deportation is first predicated on civil denaturalization. Therefore, it is misguided to eschew the direct/collateral framework in this case on the basis of *Padilla*. I would instead adhere to that framework and hold that the Sixth Amendment does not require defense counsel to warn naturalized citizen clients of the collateral risks of denaturalization and (if denaturalized) deportation.

Even assuming, *arguendo*, that the Sixth Amendment does require such a warning, Farhane's ineffective assistance of counsel claim fails both prongs of *Strickland*'s test. As the district court correctly concluded, Farhane's representation was not objectively unreasonable because Farhane failed to give his attorney the factual information necessary to understand how Farhane's plea might pose a future risk of denaturalization or deportation. Any suggestion that

the deficient-performance inquiry here should be synonymous with the one in *Padilla* ignores the numerous factors that make Farhane's counsel's representation much more reasonable than that of Padilla's counsel, such that Farhane's representation, even if imperfect, was not so seriously flawed as to be constitutionally deficient. Finally, the record before us is entirely sufficient to demonstrate that Farhane was not prejudiced by his counsel's purportedly inadequate performance.

I do not believe that we should attempt to shoehorn this case, which is premised on different statutes and facts, into the narrow mold of *Padilla*. I therefore respectfully dissent.

PARK, *Circuit Judge*, joined by SULLIVAN, NARDINI, and MENASHI, *Circuit Judges*, dissenting:

A narrow majority of our court today announces a new constitutional rule of criminal procedure that is not only wrong but barred by the Supreme Court's doctrine against retroactive application of such rules on federal collateral review. *See Teague v. Lane*, 489 U.S. 288, 316 (1989). Although the government did not raise *Teague* in the district court, the issue has been squarely presented to us, so we can and should reach it. The majority's refusal to do so disregards well-settled principles of constitutional avoidance and undermines the finality of convictions.

## I.

The Supreme Court "has repeatedly stated that a decision announcing a new rule of criminal procedure ordinarily does not apply retroactively on federal collateral review." *Edwards v. Vannoy*, 593 U.S. 255, 258 (2021). "[A]pplying 'constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system.'" *Id.* at 263 (quoting *Teague*, 489 U.S. at 309).

"Under *Teague*, a case announces a new rule when it breaks new ground or imposes a new obligation on the government; in other words, it does so if the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Hall v. United States*, 58 F.4th 55, 60 (2d Cir. 2023) (cleaned up). A result "is not so dictated 'unless it would have been apparent to all reasonable jurists.'" *Id.* (quoting *Chaidez v. United States*, 568 U.S. 342, 347 (2013)).

The rule the majority announces—that the Constitution requires counsel to advise criminal defendants about the risk of denaturalization—is plainly new and thus barred by *Teague.* Our disagreement about the scope of the Sixth Amendment and the absence of any case law adopting the majority's rule before today show that the majority's decision is clearly not so dictated by precedent as to be "apparent to all reasonable jurists." *Id*. (internal quotation marks omitted); *see Butler v. McKellar*, 494 U.S. 407, 415 (1990) (concluding that a rule was new under *Teague* because it "was susceptible to debate among reasonable minds").

The majority characterizes its holding as merely an application of *Padilla v. Kentucky*, 559 U.S. 356 (2010), and asserts that "the risk of denaturalization simply *is* a risk of deportation." *Ante*, at 16. But that oversimplification strains credulity for the reasons explained in Judge Walker's dissent. *See ante*, at 8-9. It also does not avoid *Teague*, which bars both "the invocation of a rule that was not dictated by precedent" *and* "the application of an old rule in a manner that was not dictated by precedent." *Stringer v. Black*, 503 U.S. 222, 228 (1992); *see also Butler*, 494 U.S. at 415 ("[T]he fact that a court says that its decision is within the logical compass of an earlier decision, or indeed that it is controlled by a prior decision, is not conclusive for purposes of deciding whether the current decision is a new rule under *Teague*." (quotation marks omitted)). Put simply, the majority's rule is new because "[d]eportation . . . is 'unique.'" *Chaidez v. United States*, 568 U.S. 342, 352 (2013) (quoting *Padilla*, 559 U.S. at 365). The Supreme Court explicitly limited *Padilla* to deportation only, so we cannot simply apply that case to encompass other things that carry a "risk of deportation." The very exercise of explaining why *Padilla* covers

2

denaturalization requires the court to "develop new law[] establishing that the Sixth Amendment applie[s] at all." *Id.* at 355.

*Padilla* does not dictate an outcome in this case, much less one that is apparent to all reasonable jurists. Like the merits panel and nearly half of the en banc court, the panel that granted the *Anders* motion in Farhane's direct appeal also did not think that *Padilla* dictates today's result. *See* Order, *United States v. Farhane*, No. 07-1968(L) (2d Cir. Feb. 4, 2011). This is unsurprising. When the Judicial Conference Committee on Rules of Practice and Procedure amended Rule 11 after *Padilla*, it said nothing about citizens or denaturalization. Indeed, it specifically addressed only "a defendant who is not a United States citizen." Fed. R. Crim. P. 11(b)(1)(O). So the claim that *Padilla* dictates the outcome here is untenable—until today, neither the Rules Committee nor any court in the nation had accepted the majority's rule. *See, e.g.*, *United States v. Reeves*, 695 F. 3d 637, 640 (7th Cir. 2012) ("*Padilla* is rife with indications that the Supreme Court meant to limit its scope to the context of deportation only."). For *Teague* purposes, that ends the inquiry, and we should conclude that Farhane is barred from seeking his new rule on collateral review. *See Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993) ("*Teague* stands for the proposition that new constitutional rules of criminal procedure will not be announced or applied on collateral review.").

## II.

The majority tries to avoid *Teague* by pointing to the government's failure to raise it below. *Ante*, at 32. It is true that the government did not raise the issue in the district court. But that does not matter. Courts have discretion to overlook a forfeiture generally and should exercise that discretion to address *Teague* specifically.

3

A "*Teague* analysis is ordinarily our first step when we review a federal habeas case." *Schiro v. Farley*, 510 U.S. 222, 228 (1994). When the government "argue[s] that the defendant seeks the benefit of a new rule of constitutional law, the court *must* apply *Teague* before considering the merits of the claim." *Caspari v. Bohlen*, 510 U.S. 383, 389 (1994). To be sure, a *Teague* argument can be waived or forfeited in certain circumstances. The Supreme Court has stated that it is not required to consider *Teague* when a party raises it for the first time after the Court has issued a writ of certiorari—because mandatory consideration of such an "eleventh-hour *Teague* argument" could "insulate[]" from the Court's review the question on which the Court granted certiorari. *Buck v. Davis*, 580 U.S. 100, 127–28 (2017); *see Schiro*, 510 U.S. at 229. Based on *Schiro*, we have held that a *Teague* argument raised for the first time in a petition for rehearing (*i.e.*, after the panel has already announced a decision on the merits) may, but need not, be addressed. *See Agard v. Portuondo*, 159 F.3d 98, 100 (2d Cir. 1998). We have never held, however, that we may reverse a district court's judgment—and announce a new rule of constitutional law—without addressing a *Teague* argument timely raised on appeal in defense of that judgment.[1] We should not do so today for three reasons.

---

[1] The panel majority incorrectly said that the government waived (rather than forfeited) *Teague*, *see Farhane v. United States*, 77 F.4th 123, 126 n.4 (2d Cir. 2023), but not even Farhane argues waiver, *see United States v. Graham*, 51 F.4th 67, 79-80 (2d Cir. 2022) (distinguishing forfeiture from waiver). In any event, we have in unusual circumstances overlooked a *Teague* argument to *reject* the merits of a habeas petition, as the panel majority did here. *See Ayala v. Speckard*, 131 F.3d 62, 68 (2d Cir. 1997).

First, and most important, *Teague* would resolve this case without requiring us to decide a constitutional question. The en banc majority justifies its refusal to overlook forfeiture by pointing out that a successful *Teague* argument would prevent the en banc Court from announcing a new rule of constitutional law. *See ante*, at 31-33. Precisely. "[A] longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the *necessity* of deciding them." *Camreta v. Greene*, 563 U.S. 692, 705 (2011) (emphasis added) (internal quotation marks omitted). Given that we are free to overlook forfeiture, it cannot be said that this case requires us to announce a new constitutional rule.

Second, *Teague*'s applicability is a purely legal question, one that Farhane had the opportunity to address—and did in fact address—both before the panel and on rehearing en banc. The issue is thus fully briefed for our review. Moreover, as the appellee, the government "is entitled to rely on any legal argument in support of the judgment below." *Schiro*, 510 U.S. at 228-29; *see also Dandridge v. Williams*, 397 U.S. 471, 475 n.6 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.").

Third, *Teague* protects the finality of convictions. Finality ensures stability and predictability, upholds the rights of victims, and affords defendants the closure necessary for rehabilitation. *See, e.g.*, *McCleskey v. Zant*, 499 U.S. 467, 491 (1991) ("Neither innocence nor just punishment can be vindicated until the final judgment is known."); *Edwards*, 593 U.S. at 263 ("When previously convicted perpetrators of violent crimes go free merely because the evidence

5

needed to conduct a retrial has become stale or is no longer available, the public suffers, as do the victims." (citing *United States v. Mechanik*, 475 U.S. 66, 72 (1986))). The values that undergird finality explain why *Teague* applies even if a defendant never had a prior opportunity to present his claim. *Cf. Breard v. Greene*, 523 U.S. 371, 376-77 (1998) (noting that, even if the defendant could not have discovered his claims earlier, they "would be barred on habeas review under *Teague*"). That interest in finality is particularly salient here, given that Farhane pleaded guilty 18 years ago to conduct that began 23 years ago. Indeed, Farhane now seeks—13 years after his conviction became final—to force the government to retry him "hampered by problems of lost evidence, faulty memory, and missing witnesses." *Allen v. Hardy*, 478 U.S. 255, 260 (1986) (cleaned up).

I note one final concern with the majority's decision to ignore *Teague*. In treating *Teague* as forfeited, the majority assures us that its decision will not "open the floodgates" to additional challenges. But the logic of its decision says otherwise. The majority reasons that its rule flows inexorably from *Padilla* and is thus not a new rule at all.[2] *Ante*, at 33 ("*Padilla* dictates this result."). For the reasons already stated, I think that is clearly wrong. But if the rule

---

[2] Farhane's arguments on this point are not only incompatible with finality; they are internally inconsistent. On one hand, he says his § 2255 motion is timely because he could not have known the facts necessary to file it until the government began denaturalization proceedings. On the other hand, he argues that the risk of deportation flows automatically from his conviction, which became final after *Padilla*. He cannot have it both ways. Either *Padilla* dictated the outcome here the day it was decided (meaning that Farhane could have discovered his claim through the exercise of due diligence on that date, *see* § 2255(f)(4)), or deportation does not flow automatically from his guilty plea.

6

announced today is "old," the majority invites thousands of natural-
ized citizens convicted in the fourteen years since *Padilla* to challenge
long-final state and federal convictions—virtually none of which will
involve any real risk of denaturalization or deportation.  *See* Dissent
of Walker, J., *ante*, at 2-9.  Had the majority addressed *Teague*—and
still announced its constitutional rule—it would at least have been
forced to confront the consequences of its decision.

In sum, *Teague* applies here and guards against unnecessarily
announcing a new constitutional rule, which is the only thing the ma-
jority does.  The majority does not say that Farhane's counsel was
objectively unreasonable or that Farhane was prejudiced by any defi-
ciency.  Instead, the majority reaches out to announce a new Sixth
Amendment rule without deciding whether Farhane is even entitled
to relief under any approach.  This turns constitutional avoidance on
its head.

For these reasons, I respectfully dissent.[3]

---

[3] Most of the court concludes that *Teague* is not an impediment to
reaching the merits, so having been outvoted on that issue, I would affirm
for the reasons articulated by Judge Walker.  *See, e.g.*, *Hanover 3201 Realty,
LLC v. Village Supermarkets, Inc.*, 806 F.3d 162, 189-96 (3d Cir. 2015) (Ambro,
J., concurring in part) (discussing voting protocols in multi-issue cases).

NARDINI, *Circuit Judge*, dissenting:

I join Judge Park's dissenting opinion explaining that *Teague v. Lane*, 489 U.S. 288 (1989), bars the majority's holding; and I join Part I of Judge Walker's dissenting opinion, which explains why the Sixth Amendment does not require criminal defense attorneys to advise naturalized citizen clients of the collateral risks of denaturalization and (if denaturalized) deportation that may arise from a guilty plea. However, while I thoroughly agree with the application of *Strickland v. Washington*, 466 U.S. 668 (1984), in Part II of Judge Walker's dissent, I believe that the district court should undertake that analysis in the first instance. On remand, the district court will be free to address the performance and prejudice prongs in whichever order it thinks best and can supplement the record as it deems necessary. And if the district court addresses the prejudice prong, it will be able to make factual findings—including as to the dispositive question of whether Farhane would have proceeded to trial had his attorney informed him

of the risk of denaturalization and deportation—that would be subject to reversal only for clear error.

Accordingly, I respectfully dissent for the reasons stated by Judge Park with respect to the *Teague* issue, and for the reasons stated by Judge Walker with respect to the *Padilla* issue.